2009 ME 30

## NESTLE WATERS NORTH AMERICA, INC.

v.

## TOWN OF FRYEBURG et al.

Supreme Judicial Court of Maine.

Argued: Jan. 13, 2009.
Decided: March 19, 2009.

Philip F.W. Ahrens, Esq., Catherine R. Connors, Esq. (orally), Brian M. Rayback, Esq., Pierce Atwood LLP, Portland, ME, for Nestle Waters North America, Inc.

John J. Wall, III, Esq. (orally), Monaghan Leahy, LLP, Portland, ME, for the Town of Fryeburg.

Scott D. Anderson, Esq. (orally), Verrill Dana LLP, Portland, ME, for Western Maine Residents for Rural Living.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

MEAD, J.

[¶ 1] Nestle Waters North America, Inc., d/b/a Poland Spring Bottling Company (Poland Spring), appeals pursuant to M.R. Civ. P. 80B from a judgment of the Superior Court (Oxford County, *Cole, J.*) affirming a 2007 decision of the Fryeburg Planning Board (Planning Board) to deny Poland Spring a permit to build a water loadout facility. That judgment followed the original decision by the Planning Board in 2005 to issue the permit; the reversal of that decision by the Fryeburg Board of Appeals (BOA); a judgment of the Superior Court vacating the BOA's decision and remanding the matter to the Planning Board for consideration of an additional criterion; and an appeal to this Court that was dismissed as interlocutory. *Griswold v. Town of Denmark*, 2007 ME 93, ¶ 18, 927 A.2d 410, 417. The Town of Fryeburg and Western Maine Residents For Rural Living (WMRRL), a citizens group that is a party-in-interest, cross-appeal, contending that the Planning Board erred when it granted the permit in 2005. We vacate the judgment, concluding that the Superior Court erred in requiring the Planning Board to consider an additional criterion taken from the Fryeburg comprehensive plan.

## I. BACKGROUND

[¶ 2] In June 2005, Poland Spring applied to the Town for a permit to build a "loadout facility" on three acres of a fifty-nine acre parcel located close to Route 302, a major thoroughfare in the region. The proposed facility is part of a project that will extract water from aquifers in the Town of Denmark, then pipe it to Fryeburg.[1] Once the water arrives in Fryeburg, it will be stored in a silo. A building with a concrete loading pad to be built at the site will allow the facility to fill up to fifty water transport trucks per day.

[¶ 3] The Town has in place a comprehensive plan, adopted in 1994, and a land use ordinance, originally adopted in 1998, in part to "[i]mplement portions of the Town's Comprehensive Plan." After Poland Spring filed its application, the Planning Board determined at an initial public meeting that Poland Spring's proposal qualified under the land use ordinance, if at all, as an "omitted use" for the rural residential district in which it would be located. Omitted uses are governed by section five of the ordinance, which is applicable to each type of land use district in Fryeburg. Section five provides, in part:

D. Uses Omitted from the Land Use Table

If in the opinion of the Code Enforcement Officer a proposed use is not specifically mentioned, or covered by any general category in the enumeration of permitted or prohibited uses for each district, said use shall only be granted upon showing by the applicant that the soils, location and lot are suitable for the proposed use and will not unreasonably interfere with the use and enjoyment of their property by adjacent landowners and that the use will conform to all other requirements of the district involved and the performance standards of Sections

---

1. We affirmed the decision of the Denmark Board of Selectmen to grant Poland Spring a water extraction permit. *Griswold v. Town of Denmark*, 2007 ME 93, ¶ 15, 927 A.2d 410, 416.

Sixteen and Seventeen of this Ordinance.[2]

[¶ 4] The Planning Board heard a public presentation on the proposal in August 2005, and held a formal public hearing in September 2005 attended by some 100 citizens. At that hearing, the results of a vehicle traffic peer review study commissioned by the Board were presented. In October 2005, the Planning Board held a final meeting to consider additional information it had received concerning the proposal. In extensive written findings, the Planning Board found that Poland Spring's project met the standards set out in the ordinance to qualify as an omitted use in the rural residential district. After attaching numerous conditions to the permit, the Planning Board approved it by a 4–1 vote.

[¶ 5] WMRRL appealed the Planning Board's decision to the BOA. Following two public hearings in January 2006, the BOA upheld all of the Planning Board's findings and conclusions save one: it concluded by a 3–2 vote that the "Planning Board erred in finding that the proposed use would not unreasonably interfere with the use, enjoyment and property values of the adjacent land owners in violation of Section 5D." The BOA granted WMRRL's appeal and vacated the Planning Board's decision to grant the permit.

[¶ 6] Poland Spring filed a complaint pursuant to M.R. Civ. P. 80B in the Superior Court, seeking to reverse the BOA's action. In its decision, the court found that the Planning Board correctly categorized the loadout facility as an omitted use under the land use ordinance, meaning the project would qualify for a permit under section 5(D) if: (1) the soils, location and lot were suitable; (2) there was no unreasonable interference with adjacent landowners' use and enjoyment of their property; and (3) the project "conform[ed] to all other requirements of the district involved," and with the standards outlined in section sixteen of the ordinance.

[¶ 7] The court focused on the second and third of these requirements.[3] It concluded, contrary to the BOA, that the Planning Board's finding that the project would not unreasonably interfere with adjoining landowners' property rights was supported by substantial evidence in the record.

[¶ 8] In analyzing the third requirement, the court looked to both the ordinance and the comprehensive plan, considering their statements of purpose for the rural residential district. Section fourteen of the ordinance, specifically governing the rural residential district, states that:

The purpose of the Rural Residential District is to provide protection to the Town's rural resources; timber harvesting and growing areas, agricultural areas, natural resource based, business and recreation areas, open spaces, and rural views; while maintaining a rural land use pattern much like that which existed in Fryeburg in the last century; large contiguous open space areas, farmland, land in the Tree Growth tax classification and other forest land, land in which the predominant pattern of development consists of homes and compatible, non-intensive home occupations and

2. Section sixteen of the ordinance sets out general performance standards applicable to all land use categories; section seventeen sets out performance standards for specific uses not applicable here such as adult businesses, automobile graveyards, etc. The Planning Board found that none of the uses regulated by section seventeen applied to Poland Spring's project.

3. The Planning Board found that the "soils, location and lot" requirement had been met, and the Town concedes the point in its brief to this Court.

businesses interspersed among large open spaces.

[¶ 9] The comprehensive plan lists ten "various techniques which will foster the ruralness we all enjoy." One of the ten states:

The only business-type of land uses to be allowed in the rural area will be resource-based businesses, home occupations and other home-based businesses, businesses that while perhaps are not "in the home" are located on the same or adjoining lot(s), and "low impact" businesses. Low impact businesses would be those which are limited in size or amount of traffic.

[¶ 10] First examining the ordinance, the court found that although the Planning Board erred in finding that Poland Spring's project qualified as a natural resource-based business, there was substantial evidence in the record to support its conclusion that the loadout facility constituted a "non-intensive" business. Additionally, the court found no error in the Planning Board's conclusion that the project complied with all requirements imposed by section sixteen of the ordinance.

[¶ 11] The court found, however, that in applying the land use ordinance the Planning Board had not considered the comprehensive plan's provision that businesses in the rural residential district were to be "low impact" enterprises "limited in size or the amount of traffic." In a later decision the court explained that, in its view, section 5(D)'s requirement that the project "conform to all other requirements of the district involved" included requirements found in the comprehensive plan.

[¶ 12] In sum, the Superior Court found that Poland Spring's project satisfied all of the requirements of section 5(D) of the ordinance, governing omitted uses generally, and also satisfied the "non-intensive" standard found in the purpose clause of section fourteen of the ordinance, specifically governing the rural residential district. The court found that the "low impact" requirement contained in the comprehensive plan, which it incorporated into the ordinance through section 5(D)'s "all other requirements of the district involved" clause, had not been addressed. Accordingly, the court remanded Poland Spring's application back to the Planning Board for findings on whether the project met the comprehensive plan's "low impact" standard.

[¶ 13] Following the remand and our subsequent dismissal of Poland Spring's interlocutory appeal in *Griswold*, the Planning Board held three preliminary meetings, a workshop session, and another public hearing. On November 13, 2007, the Planning Board met to decide on Poland Spring's application for the second time. Explicitly restricting itself to the issue identified by the Superior Court, the Planning Board decided by a 3–1 vote that the loadout facility was not a low impact business under the comprehensive plan, and denied the permit.[4]

[¶ 14] Poland Spring appealed the Planning Board's decision to the BOA, which affirmed 3–1, and then to the Superior Court, which also affirmed. This appeal followed.

## II. DISCUSSION

 [¶ 15] Poland Spring argues that the Superior Court erred in finding an additional criterion for approval of its permit application in the comprehensive plan,

---

4. Due to turnover and the involuntary recusal of the Planning Board's chairman for a potential conflict of interest, only one of the four members who voted had also voted at the October 2005 meeting when the permit was approved.

contending that the court should have affirmed the Planning Board's 2005 decision to approve the permit based on the court's conclusion that the project otherwise satisfied the requirements of the land use ordinance. Poland Spring asserts that the Fryeburg comprehensive plan provides an overall land management strategy and guidance for the adoption of appropriate ordinances, but only the land use ordinance is regulatory.

[¶ 16] This issue is the threshold question before us, because if the Superior Court erred in imposing an additional requirement from the comprehensive plan, and if sufficient evidence supports its conclusion that the requirements of the ordinance were otherwise met, then we must affirm the Planning Board's 2005 decision to grant the permits.[5] *See Spain v. City of Brewer*, 474 A.2d 496, 500 (Me.1984) (stating that a permit cannot be denied "on grounds other than those specified by statute or local ordinance"; also stating that "where the applicant has demonstrated compliance with all the statutory criteria, the municipal officers must issue the permit"). If the court correctly imposed the additional requirement, then the Planning Board's 2007 decision to deny the permit, reached after considering the new criterion, must be affirmed if supported by sufficient evidence. Based on the language of the applicable statutes, the comprehensive plan, and the ordinance, we conclude that the Fryeburg comprehensive plan is visionary, not regulatory, and therefore the Superior Court erred in imposing a requirement for permit approval beyond those set out in the ordinance.

A. Statutory Language

[¶ 17] The Legislature has enacted a growth management program, one purpose of which is to "[e]stablish, in each municipality of the State, local comprehensive planning and land use management." 30–A M.R.S. § 4312(2)(A) (2008). A town may accomplish that purpose, as Fryeburg has, by adopting a comprehensive plan consistent with legislative guidelines. 30–A M.R.S. § 4324(1) (2008). A comprehensive plan is a mandatory element of a municipality's growth management program. 30–A M.R.S. § 4326 (2008).

[¶ 18] The comprehensive plan itself has certain mandatory components, one of which is an "implementation strategy" that includes the adoption of land use ordinances. 30–A M.R.S. § 4326(3). Beyond the logical conclusion that a comprehensive plan would not need an implementation strategy if it were regulatory standing on its own, the Legislature's description of an acceptable implementation strategy indicates that it anticipated further municipal action in order to enforce the comprehensive plan's policies:

A comprehensive plan must include an implementation strategy section that contains a timetable for the implementation program, including land use ordinances, ensuring that the goals established under this subchapter are met. These implementation strategies must be consistent with state law and must actively promote policies developed during the planning process. The timetable must identify significant ordinances to be included in the implementation program. The strategies and timetable must guide the subsequent adoption of policies, programs and land use ordinances and periodic review of the comprehensive plan.

30–A M.R.S. § 4326(3).

[¶ 19] The statutory definitions of key terms used in this description reinforce the

---

**5.** The Superior Court noted that Poland Spring's challenge to its remand order has been preserved for appeal. *See* M.R. Civ. P. 80B(m).

conclusion that the comprehensive plan is just that—a plan—and the ordinances adopted pursuant to the plan are its regulatory teeth. *See* 30–A M.R.S. § 4312(2)(C) (2008) (Legislature's purpose in growth management program is to "[e]ncourage local land use ordinances, tools and policies based on local comprehensive plans"); Fryeburg Land Use Ordinance, § 1(D)(1)(n) ("[one] purpose[ ] of this Ordinance [is] to ... [i]mplement portions of the Town's Comprehensive Plan").

[¶ 20] A comprehensive plan's "implementation program" is:

> that component of a local growth management program that begins after the adoption of a comprehensive plan and that includes the full range of municipal policy-making powers, including spending and borrowing powers, as well as the powers to adopt or implement ordinances, codes, rules or other land use regulations, tools or mechanisms that carry out the purposes and general policy statements and strategies of the comprehensive plan in a manner consistent with the goals and guidelines of [the state growth management program].

30–A M.R.S. § 4301(7) (2008).

[¶ 21] As a component of the implementation program, a "land use ordinance" is:

> an ordinance or regulation of general application adopted by the municipal legislative body which controls, directs or delineates allowable uses of land *and the standards for those uses.*

30–A M.R.S. § 4301(8) (2008) (emphasis added).

■ [¶ 22] Applying the plain language of these statutes, after a compre-

hensive plan is adopted, the implementation program begins. That program includes the power to enact ordinances to carry out the purposes and general policies of the comprehensive plan. The ordinances so enacted are the means for the municipality to control the allowable uses of land and set the standards by which those uses are permitted. Ordinances must be consistent with the comprehensive plan, but so long as they are, the requirements of the ordinance are the concrete standards to be applied by municipal legislative bodies.

■ [¶ 23] This construction is consistent with the Legislature's directive that "[a] zoning ordinance must be pursuant to and consistent with a comprehensive plan adopted by the municipal legislative body." 30–A M.R.S. § 4352(2) (2008); *see F.S. Plummer Co., Inc. v. Town of Cape Elizabeth*, 612 A.2d 856, 859 (Me.1992) (stating that zoning classification following zoning ordinance amendment reviewed for constitutionality and basic harmony with comprehensive plan). We have recognized that "[t]he comprehensive plan that ... every municipality [is required] to have as a prerequisite to zoning is by definition a compilation of policy statements, goals and standards with respect to issues relevant to land use regulation." *LaBonta v. City of Waterville*, 528 A.2d 1262, 1264 (Me. 1987) (quotation marks omitted). A zoning ordinance is consistent with its parent comprehensive plan if it "[strikes] a reasonable balance among the [municipality's] various zoning goals." [6] *Id.* at 1265.

[¶ 24] The comprehensive plan and the land use ordinance are complementary, but their purposes are different. The plan

---

**6.** We note that the Fryeburg land use ordinance is not being challenged here. The issue is whether Poland Spring satisfied the requirements of the ordinance; no party is chal-

lenging the requirements themselves or the classification of the proposed project as lying within the rural residential district.

sets out what is to be accomplished; the ordinance sets out concrete standards to ensure that the plan's objectives are realized. The two are not meant to be interchangeable.[7] A comprehensive plan imposes an obligation on the *town,* not on private citizens or applicants for permits. It dictates how the town effectuates its land use planning obligations. The ordinance is the translation of the comprehensive plan's goals into measurable requirements for applicants like Poland Spring. In this case the Town chose to implement the comprehensive plan's "low impact" objective for the rural residential district through the ordinance's "non-intensive" standard applied by the Planning Board in 2005.

B. Language of the Comprehensive Plan

[¶ 25] From its first page, the Fryeburg comprehensive plan emphasizes its role as a visionary, goal-oriented document. The cover states that the plan is "a guide for the future of our town." The introduction stresses that purpose (emphasis in original):

> The Comprehensive Plan should be thought of as a blue print or a road map. *It is a guide* that, if used properly, will help us to achieve our community goals. The Comprehensive Plan does not attempt to understand and plan for the ultimate development or "build out" of the town, rather it recognizes *the planning process as a continuing process* and that various parts of the plan are subject to refinement, periodic review, and updating so as to be of constant value.

. . . .

The Comprehensive Plan is a statement of the community's vision of the future.

[¶ 26] In a section entitled "Implementation Strategies," the comprehensive plan recognizes and anticipates that further regulatory action will be needed to realize its goals (all emphasis in original):

> This chapter of our Comprehensive Plan provides strategies that the appropriate staff, board or committee should follow to achieve our community's goals and policies. The chapter will explain what should be done, when, by whom, and why.
>
> In each section of this chapter there are actions that should be taken if the Plan is to be implemented. All of the implementation actions which involve the adoption of new ordinances, the amendment of existing ordinances, or the raising of money will require Town Meeting approval.

. . . .

The Land Use Plan is **NOT** a zoning ordinance or zoning map. The land use plan is a mapped representation of the community's goals as they relate to the use of land. It is our community's policy statement of where various land uses should be located in the future.

. . . .

**Again, this Future Land Use Map is not a zoning map!** The areas shown are only generalized locations of appropriate future land uses.

The following descriptions summarize the preferred land use and development

---

7. One commentary put it this way:
The comprehensive plan ... is the overarching document, the grand design. Once this statement is in place, it is appropriate to talk about plan implementation, but not before. Any other sequencing gets the cart before the horse.

Orlando E. Delogu, Samuel B. Merrill, and Philip R. Saucier, *Some Model Amendments to Maine (and Other States') Land Use Control Legislation,* 56 Me. L.Rev. 323, 339–40 (2004).

pattern for each of the land use areas. It also gives the reasons why this land use pattern is being recommended.

■ [¶ 27] Words such as "should," "generalized," "preferred," and "recommended" are words of suggestion, not commands of regulation. *Cf.* Fryeburg Land Use Ordinance § 5(D) ("[An omitted use] *shall only* be granted upon showing by the applicant that....") (emphasis added). The comprehensive plan does not hold itself out as regulatory, to the contrary it emphasizes that it is a planning document.[8]

### C. Interpretation of Ordinance § 5(D)

[¶ 28] The Superior Court found that the policy statements of the Fryeburg comprehensive plan were incorporated into the land use ordinance through the clause in section 5(D) that states an omitted use must "conform to all other requirements of the district involved" in order to be approved. A substantial part of the land use ordinance comprises ten sections, each setting out the purpose, location, dimensional requirements, and permitted uses of a specific district.[9]

[¶ 29] Section 14 of the ordinance governs the rural residential district in which Poland Spring's facility would be located. It sets out the general purposes of the district, specifies that its location is established on the official zoning map, gives specific dimensional requirements for various types of projects, and references the uses specifically permitted in the district. Nowhere is there any reference to the comprehensive plan. Section 5(D) applies to all ten districts governed by the ordinance. In this case, the natural construction of section 5(D)'s "requirements of the district involved" clause is that it means the requirements of section 14, not a potential requirement found in the comprehensive plan or some other external source. *See Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶ 22, 868 A.2d 161, 167 (stating that "the terms or expressions in an ordinance are to be construed reasonably with regard to ... the general structure of the ordinance as a whole" (quotation marks omitted); also stating that when construing an ordinance, "we look first to the plain language of the provisions to be interpreted").

[¶ 30] In sum, because the statutes, the comprehensive plan, and the ordinance are consistent in pointing to the ordinance as the source of the requirements Poland Spring had to meet in order to obtain a permit, the Superior Court erred in imposing a criterion not found in the ordinance.

### D. Sufficiency of the Evidence

■ [¶ 31] The Planning Board decided in 2005 that Poland Spring met the requirements of the ordinance and issued the permit; in 2007 it did not revisit the ordinance's requirements, rather it decided only that Poland Spring did not satisfy the additional "low impact" criterion considered as a result of the Superior Court's remand and therefore denied the permit. Because the court erred in remanding the matter once it concluded that substantial evidence supported the Planning Board's

---

8. Provisions in a comprehensive plan can be given regulatory effect through purposeful incorporation into a land use ordinance. *See, e.g., Ogunquit Sewer Dist. v. Town of Ogunquit*, 1997 ME 33, ¶ 7, 691 A.2d 654, 657 (statute specifically gave comprehensive plan regulatory effect along with ordinance). The Fryeburg comprehensive plan/land use ordinance scheme does not do so.

9. The separately enumerated districts are: village residential, village commercial, outlying village residential, residential-commercial, outlying residential-commercial, general commercial, industrial, mobile home park overlay, rural residential, and wellhead protection overlay.

finding that the requirements of the ordinance had been satisfied, the actions taken by the Planning Board in 2007 were nugatory.[10] *See Brackett v. Town of Rangeley,* 2003 ME 109, ¶ 27, 831 A.2d 422, 430 (Alexander, J., concurring) ("When a public officer or agency exceeds its statutory authority or proceeds in a manner not authorized by law, its resulting orders, decrees or judgments are null and void...."). Accordingly, we turn to a review of the Planning Board's original decision.

■ [¶ 32] Throughout the permitting process, both the Fryeburg Board of Appeals and the Superior Court acted only in an appellate capacity. We therefore review the Planning Board's 2005 decision directly for "abuse of discretion, errors of law, or findings not supported by substantial evidence in the record." *Griswold,* 2007 ME 93, ¶ 9, 927 A.2d at 414 (quotation marks omitted); *see Gensheimer,* 2005 ME 22, ¶¶ 7, 16, 868 A.2d at 163, 166 (stating the general rule that "[w]hen the Superior Court acts as an appellate court, we review directly the operative decision of the municipality" (quotation marks omitted); also stating that "[when] the proper role of the Board of Appeals ... is appellate review, the decision of the Planning Board is the operative decision of the municipality" (quotation marks omitted)). Substantial evidence exists "when a reasonable mind would rely on that evidence as sufficient support for a conclusion." *Griswold,* 2007 ME 93, ¶ 9, 927 A.2d at 414 (quotation marks omitted).

■ [¶ 33] The Planning Board's factual findings are reviewed deferentially; we do not substitute our own judgment for that of the Board. *Id.,* 927 A.2d at 414–15. To the contrary, "[t]he fact that the record before the Board is inconsistent or could support a different decision does not render the decision wrong; the Board's decision should be vacated only if no competent evidence exists in the record to support it." *Id.,* 927 A.2d at 415. In contrast to the deferential review accorded the Planning Board's factual findings and conclusions, its interpretation of the ordinance to which those facts are applied presents a question of law subject to de novo review. *JPP, LLC v. Town of Gouldsboro,* 2008 ME 194, ¶ 8, 961 A.2d 1103, 1105.

■ [¶ 34] In its 2005 written decision, the Planning Board recognized its obligation to apply the land use ordinance impartially, and identified the applicable provision as section 5(D), governing omitted uses:[11]

---

**10.** This case is distinguishable from *Carroll v. Town of Rockport,* where we said that "no local decision-making process can be considered over until it is over." 2003 ME 135, ¶ 18, 837 A.2d 148, 154. *Carroll* involved several decisions and subsequent changes of mind by the Rockport planning board and board of appeals. At the conclusion of that process, there was an appeal to the Superior Court. The unremarkable point we made in *Carroll* was that a party cannot appeal until there is a final local decision. Here there was a final local decision—the Planning Board approved the permit in 2005, the Board of Appeals reversed, and then there was an appeal to the Superior Court. Applying *Carroll,*

at that point the process was over at the local level.

**11.** Poland Spring and the Town agree that section 5(D) governs Poland Spring's permit application. In a letter to the Planning Board dated October 25, 2007, WMRRL also appeared to agree by saying: "Nestle's trucking facility is an 'omitted use' as that term is used in the Fryeburg Land Use Ordinance ... because 'trucking facility' is not listed on the Land Use Table." In its brief to this Court, WMRRL now argues that the proposed use should have been classified as "processing goods" and thus automatically barred in the rural residential district. To the extent

[Poland Spring's] application has clearly raised concerns by residents in the general proximity of the proposed use. Significant activity to oppose the use has been generated and has been reflected in the input at Planning Board meetings and in the public hearing on the application. The Board notes also, that a number of residents have supported the use. ... While the concerns expressed are deeply believed by their proponents, the Board must apply the Ordinance, and not treat the relative positions of citizens and the applicant as a referendum, with a decision based on the weight of opinion, rather than the provisions of the Ordinance itself.

The core concern of the opponents to this application relate to allowance of the proposed use in a rural residential zone. As indicated below, the Board decisions are based on Section 5D of the [ordinance]—Uses Omitted from the Land Use Table. In applying this section, the Board must deal with the Ordinance as it exists today.

[¶ 35] Section 5(D) required the Planning Board to determine whether Poland Spring had shown that (1) the soils, location and lot were suitable for the loadout facility; (2) the facility would not unreasonably interfere with adjacent landowners' use and enjoyment of their property; (3) the use would conform to "all other requirements of the district involved"; and (4) the facility met the performance standards of section 16 of the ordinance. The Board's findings on each of these requirements are discussed below.

### 1. Soils, Location and Lot

■ [¶ 36] The Planning Board found that the proposed project satisfied the soils, location and lot requirements based on information in the permit application and a geotechnical report submitted by an engineering firm advising Poland Spring. In its brief, the Town concedes that "[t]he Court may assume the soils and lot size are suitable for the project."

[¶ 37] The permit application included a significant amount of information concerning access control and traffic, landscaping and screening, erosion control, stormwater runoff, and environmental impact. The submission was accompanied by numerous detailed drawings prepared by the engineering firm showing the specifics of the plan. The information before the Board provided substantial evidence to support its finding that the project satisfied this provision.

### 2. Unreasonable Interference With Adjacent Landowners

■ [¶ 38] Putting "primary focus on the concerns of abutting landowners," the Planning Board found that the measures proposed by Poland Spring, coupled with the conditions the Board attached to the permit, resulted in the project avoiding unreasonable interference with nearby landowners. Specifically, the Board found:

(1) The project, located at least 300 feet from the nearest residence,[12] would not be visible from the road or from adjacent residential properties. Those buffers "substantially exceed the required setbacks for a rural residential use, and for any other use within Fryeburg zoning districts";

(2) There was no evidence that exhaust fumes would likely be transmitted through the vegetative barrier around

---

WMRRL's position was not abandoned at oral argument, we find it to be unpersuasive.

12. A noise study submitted to the Board indicated that the closest residence was approximately 625 feet from the proposed facility.

the facility given Poland Spring's indication that its drivers do not idle their vehicles while waiting to be filled or while filling. The "actual period of engine operation while the trucks are on site is quite limited";

(3) With respect to lighting, in addition to the ordinance standards already in place, Poland Spring indicated that limited lighting would be used consisting of "cut-off" fixtures that would not reflect beyond the boundaries of its lot;

(4) The Board was satisfied that the project would meet the ordinance's noise requirements by an extensive noise study submitted by a professional engineer. The study concluded that "noise sources likely to be regulated by the Fryeburg Land Use Ordinance will generate sound levels at or below the applicable sound level limits without additional noise mitigation";

(5) Any impact on property values would be speculative, therefore the Board could not find that such a potential impact constituted unreasonable interference;

(6) Poland Spring agreed to finance signs through the Maine DOT prohibiting engine braking in the area, and agreed to instruct its drivers not to use engine braking; and

(7) The project would occupy a cleared area consisting of three acres out of a 59.3 acre site, and would be buffered on all sides. The remainder of the parcel would be left in tree growth.

[¶ 39] Beyond the measures proposed by Poland Spring, the Planning Board attached twelve conditions to the permit designed to reduce the impact of the loadout facility. They included construction of a 14 foot-high noise attenuation barrier to be approved by the code enforcement officer (CEO); a requirement that Poland Spring work with adjacent landowners to minimize any glare from lighting; a requirement that Poland Spring erect signs prohibiting engine braking and bar its drivers and contractors from using engine braking; the erection of appropriate entry/exit signs on Route 302; construction of a ten-foot shoulder along the approach/entry/exit portion of Route 302; financing a post-occupancy study to be commissioned by the Board, with a fair contribution toward the remediation of any deficiencies identified; introduction of a "Share the Road" educational effort; maintenance of the parcel in tree growth, except for the portion actually used for the facility; limits on truck loading events at the facility—two per hour during the hours of 6:30–8:30 A.M., 2:30–3:30 P.M., and 5:00–7:00 P.M., four per hour otherwise, with a maximum of fifty per day; mandatory water loading reports to the CEO and mandatory inspections of the facility by the CEO; and construction of the water pipeline according to Maine Department of Environmental Protection "best management practices," as verified to the CEO by an independent professional peer review.

[¶ 40] The Planning Board also noted that the ordinance provides for the possibility of uses other than residential use in the rural residential district, and therefore determined that a subjective expectation by landowners that only residences would be permitted did not by itself create an unreasonable interference with their use and enjoyment of their property. Finally, while the Board discussed the project's traffic impact in detail in its consideration of whether the project satisfied the requirements of section 16 of the ordinance, it concluded that highway safety on Route 302, a state highway, was not a basis for finding unreasonable interference with the use and enjoyment of private property.

[¶ 41] Giving proper deference to the Planning Board's fact-finding, on this record we cannot say that the Board's decision on this point was not supported by substantial evidence.

3. Requirements of the District Involved

[¶ 42] As discussed above, we construe the "requirements of the district involved" clause of section 5(D) to mean the requirements of section 14 of the ordinance, a conclusion assumed by the Planning Board.

[¶ 43] The Board found that the project met the dimensional standards of section 14, a finding that no party has challenged. After some debate, the Board decided that it needed to consider the purpose clause of section 14 as well. It found that Poland Spring's proposal was consistent with the stated purpose of the rural residential district in four ways:

(1) The project was a "natural resource based" business. The Board found that the project was centered around water as a commodity, like timber harvesting or mineral extraction, which are specifically allowed uses in the district;

(2) The project furthered "land in the Tree Growth tax classification and other forest land" by maintaining fifty-six of the fifty-nine acres in the parcel as forested;

(3) The project "maintain[ed][a] rural land use pattern" by limiting its geographical and visual impact in a way similar to other currently-existing uses; and

(4) The project was a "non-intensive ... business[ ] interspersed among large open spaces." The Board based this finding on the permit restrictions limiting truck loading events to two per hour during peak school bus and commuting times, and four per hour otherwise, with a maximum of fifty per day. The Board noted that for eight months out of the year, the expected number of loads would average twenty-two per day.

[¶ 44] Of these four findings, the Superior Court addressed only the first and last, ruling that the proposed facility was not a natural resource-based business before concluding that substantial evidence supported the Planning Board's "non-intensive" finding. The purpose statement of section 14 is a list of broadly-described goals; it does not assign particular weight to any single consideration. Given the Board's factual findings made when analyzing the impact of the project on adjacent landowners, which are supported by substantial evidence, its conclusion that the project was consistent with the purpose of the rural residential district was not erroneous.

4. Requirements of Section 16

[¶ 45] Section 16 of the ordinance sets out general performance standards applicable to any land use or building project. The Planning Board made findings on each of the section's twenty categories, concluding that Poland Spring's proposal met the standards. The Superior Court agreed, as does the Town on appeal.

[¶ 46] The provision of section 16 most in controversy was section 16–B, dealing with access control and traffic impact. The Board considered a traffic impact study prepared by an engineering firm and submitted with Poland Spring's original application, as well as a technical traffic peer review conducted at the Town's request by an engineering firm not connected with the project. The study concluded that the project presented no major traffic concerns, and the peer review generally

agreed with that assessment.[13] Taking into account the data compiled by the two engineering firms, the Planning Board made detailed findings and concluded that the project complied with section 16–B. The engineering studies provide competent evidence to support the Board's conclusion.

[¶ 47] In sum, then, the Planning Board's finding that Poland Spring's proposed project complied with the requirements of section 5(D) of the Fryeburg land use ordinance was supported by substantial evidence in the record, and the Board's analysis reveals no error of law.[14] Accordingly, the Superior Court erred in not affirming the Planning Board's decision to grant Poland Spring a land use permit.

The entry is:

Judgment vacated; remanded for entry of judgment affirming the Fryeburg Planning Board's approval of the land use permit.

13. Discussing an issue separate from the potential traffic impact of the Poland Spring facility, the peer review study expressed concern about the physical condition of a portion of Route 302, which it opined might have contributed to a high number of "lost" control" crashes occurring on that segment. The Board used suggested improvements from the peer review study in fashioning conditions on the permit.

14. WMRRL contends that the Planning Board's forced recusal of its chair in 2007 for a potential conflict of interest invalidates its 2005 decision, in which that member participated. As the Superior Court noted, assuming *arguendo* that the member should have been recused in 2005, his participation did not affect the outcome of the 4–1 vote to approve the permit. We decline WMRRL's invitation to find that the single member imposed his will on the other members of the Board, and we do not address the issue further.