MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2013 ME 105
Docket:        Yor-12-398
Argued:        September 11, 2013
Decided:       December 5, 2013

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and
               JABAR, JJ.

ROBERT DUFFY et al.

v.

TOWN OF BERWICK et al.

JABAR, J.

[¶1]  Berwick Iron & Metal Recycling, Inc., appeals from a judgment entered in the Superior Court (York County, *Fritzsche, J.*) vacating the Berwick Planning Board's decision to grant a conditional use and site plan permit that would allow Berwick Iron to operate a metal shredder on its property.[1]  Berwick Iron argues that the court erred in vacating the Planning Board's judgment because the Board did not err in applying the ordinance governing air emissions.  Robert Duffy and other neighboring landowners who oppose the permit cross-appeal, arguing that the court erred in concluding that the Planning Board did not violate the abutters' due process rights by communicating ex parte with representatives

---

[1]  Although the Town of Berwick filed an appellant's blue brief and argued to vacate the Superior Court's judgment, it did not file a notice of appeal.  "Any party seeking to modify a judgment must file a notice of appeal to have its arguments properly considered."  *Wister v. Town of Mount Desert*, 2009 ME 66, ¶ 1 n.1, 974 A.2d 903; *see also* M.R. App. P. 2.

from Berwick Iron and in applying the provision in its ordinance pertaining to noise. We conclude that despite the Planning Board's ex parte communications with Berwick Iron, it did not violate the due process rights of the abutters or err in applying its ordinance, and thus, we vacate the court's judgment and remand for entry of a judgment affirming the Planning Board's decision.

## I. BACKGROUND

[¶2] Berwick Iron operates a metal and automobile recycling business in a rural commercial and industrial district in Berwick. The facility has been operating under an existing conditional use permit for automobile recycling. *See* Berwick, Me., Land Use Ordinance § 6.2 (Nov. 2, 2010) (providing that automobile recycling requires a conditional use permit). On September 9, 2010, Berwick Iron applied for a conditional use permit to install and operate a metal shredder for vehicles that it currently processes with front-end loaders and metal shears.

[¶3] The metal shredder processes vehicles that have been flattened and drained of all fluids before arriving onsite. The vehicles travel along a conveyor belt through the shredder, and the shredded metals are then separated into two piles of ferrous (containing iron) and nonferrous metals, loaded onto purchasers' trucks, and transported offsite. The shredder is powered by a 3,600 horsepower diesel engine, commonly used on cruise ships, which is encased by concrete walls to

muffle noise. A 45-foot stack protrudes from the top of the engine encasement, through which the engine emits diesel exhaust.

[¶4] In support of its permit application, Berwick Iron initially submitted to the Planning Board a noise study, reporting that, based on measurements taken at a similar facility in Connecticut, the anticipated noise levels would meet ordinance requirements. Berwick Iron also provided a copy of the air emissions license granted to it by the Department of Environmental Protection. An attorney representing nine abutting landowners who opposed the permit presented concerns about the metal shredder to the Board. The abutting landowners cited concerns chiefly about harmful air emissions, noise produced by the shredder and the engine, and the toxic waste product generated by automobile recycling plant—known as shredder residue or "fluff,"

[¶5] The Board considered Berwick Iron's application in an informational meeting on September 16, 2010, and in two public hearings on October 7, 2010, and February 17, 2011. During its consideration of Berwick Iron's application, the Planning Board also held two site walks without inviting members of the public.[2] The first nonpublic site walk, held on September 25, 2010, was scheduled for members of the Board, and members of the public were neither specifically invited

---

[2] Additionally, two members elected to the Planning Board in the fall of 2010 attended a private site walk with the facility's owners on October 5, 2010.

4

nor excluded. During a public meeting on January 6, 2011, the Board scheduled a second site walk to take place on January 8, 2011, and the Board chairperson asked the owner of Berwick Iron "What is your pleasure about having it open to the public?" The owner responded, "[W]e are better off just having the Planning Board come in," and the members of the Planning Board agreed. After scheduling a time for the site walk, Berwick Iron's owner interjected and offered to "invit[e]" the attorney for the abutting landowners, "if [he] would like to come," but the attorney for the abutters declined.

[¶6] On February 3, 2011, the Board adjourned its regular public meeting to hold a "workshop session" regarding Berwick Iron's pending application, without giving the opportunity for public comment. The Board indicated that it received input from the attorney for the abutting landowners and from representatives of Berwick Iron during the session, but it is unclear whether the session was closed to the public because the Board did not record this session. Additionally, Board members sent and received several emails from representatives of Berwick Iron regarding Berwick Iron's pending application, and the Board did not send copies of the emails to the abutters and did not notify the public or the abutters about the emails. On March 3, 2011, the Board unanimously voted to approve the conditional use permit and issued a written decision on March 17, 2011.

[¶7]   The abutters sought review of the Board's decision in the Superior Court.  *See* 5 M.R.S.§ 11001 (2012); M.R. Civ. P. 80B.  The court vacated the Board's decision, citing violations of the abutter's due process rights in the nonpublic site walks, meetings, and email correspondence.  The court noted that the Board's process "suggest[ed] a lack of respect for and fair treatment of the [abutters] by the Board," and that "the [abutters] did not receive the fair and unbiased hearing that they were entitled to."  The court also concluded that the Board erred in applying the air emissions standard in the ordinance.

[¶8]  On remand, the Board held a site walk that was open to the public on November 5, and two public hearings on November 17 and December 1, 2011.  Both Berwick Iron and the abutting landowners provided the Board with the opinions of sound engineers that differed on whether the project would meet ordinance sound requirements.  In response to the differing opinions, the Board scheduled a live sound test of the shredder to allow both the abutters' and Berwick Iron's sound engineers to take decibel measurements.

[¶9]  Additionally, on October 6, 2011, Berwick Iron provided a study that analyzed the project's potential air emissions and concluded that "the results of the analysis demonstrate that the project conforms with the Town of Berwick's [ordinance]."  The abutting landowners also provided a written opinion of an

emissions expert, criticizing the conclusions made in the air emissions study provided by Berwick Iron.

[¶10] Presented with the conflicting air emissions studies from Berwick Iron and the abutters, the Board decided to hire an environmental consulting firm to conduct an independent review of both studies. Because Berwick Iron was required to pay the costs of the town's independent review expert, before hiring its peer reviewer, the Board solicited estimates from three engineering firms and compared prices. The Town Planning Coordinator then contacted the attorney representing Berwick Iron, attaching the three proposals, with the following email:

> Jon St. Pierre[, the Town engineer,] gave me the names of several engineering firms and the three I contacted were Sevee & Maher (SME), Tetra Tech and MacMillian [*sic*] & Donnelly. MacMillan & Donnelly came in with the lowest estimate at $1,500, Tetra Tech at $3200 and SME['s] estimate was $5,700. I have attached the three proposals for your review.

> Please review them and let me know if you agree that I should contact MacMillan & Donnelly and instruct them to proceed with the peer review.

Berwick Iron's attorney later responded with another email stating, "Yes, it's fine with us if you instruct MacMillan & Donnelly to proceed with the peer review." Neither the Planning Coordinator nor the Board informed the public or the attorney for the abutting landowners about this exchange.

[¶11]  After the Board received the results of the sound study and evidence from the independent reviewer on the air emissions study, it voted again to approve the conditional use permit.  The Board issued its written decision on January 5, 2012, and the abutters sought review in the Superior Court.  The court vacated the Board's judgment a second time, concluding that when the Board sought approval of its choice of independent reviewers from Berwick Iron, without notifying the public or the abutters' counsel, it violated the abutters' due process rights.  Additionally, the court found that the Board again erred in applying its air emissions ordinance by relying in part on state and federal standards.

[¶12]  In a written decision on August 3, 2012, the court remanded the case to the Board to determine whether the facility met the more stringent ordinance standard for air emissions.  Berwick Iron timely appealed the court's judgment to this Court, *see* 5 M.R.S. § 11008(1) (2012); *see also* M.R. App. P. 2(b)(3), and filed a post-judgment motion requesting that the Superior Court clarify its judgment, *see* M.R. Civ. P. 59(e).  The Superior Court amended its judgment, stating, "While the Board did violate due process, that violation did not influence the outcome of the case," and "remand to correct the flawed process of choosing the Board's expert would serve no purpose."  *See* M.R. App. P. 3(b) (permitting the court to issue an order on a M.R. Civ. P. 59(e) motion to alter or amend the court's judgment pending appeal).  Further, the court clarified its judgment

8

regarding the Board's error in applying the air emissions standard, stating that the ordinance restricts even "minimal" emissions: "'Insignificant' emissions are different from no emissions. 'Minimal' is obviously different from 'nonexistent.' The Town enacted a very strict ordinance which was not met." The abutters filed a timely notice of a cross-appeal. *See* 5 M.R.S. § 11008(1); *see also* M.R. App. P. 2(b)(3).

## II. DISCUSSION

[¶13] "When the Superior Court acts in an appellate capacity we review directly a local agency's decision for abuse of discretion, errors of law, and findings not supported by the evidence." *Malonson v. Town of Berwick*, 2004 ME 96, ¶ 5, 853 A.2d 224. "The party seeking to overturn . . . [a] Board's decision[] bears the burden of persuasion." *Lane Constr. Corp. v. Town of Washington*, 2008 ME 45, ¶ 11, 942 A.2d 1202.

A.    Due Process

[¶14] The abutters argue that the Planning Board violated the abutters' due process rights when the Planning Coordinator sent an email only to the attorney for Berwick Iron seeking approval of the Board's selection of an independent reviewer, hired to assess the competing opinions of experts on air emissions.[3]

---

[3] We note that this allegation also comes after the Planning Board rendered the first decision on Berwick Iron's application. The Superior Court ultimately vacated the Board's initial decision because it was fraught with procedural violations. We pause to emphasize that local planning boards' meetings,

[¶15] Both an applicant and members of the public who oppose a project are "entitled under the [D]ue [P]rocess [C]lause of the United States and Maine [C]onstitutions to a fair and unbiased hearing." *Gorham v. Town of Cape Elizabeth*, 625 A.2d 898, 902 (Me. 1993); *see also* U.S. Const. amend. XIV § 1; Me. Const. art. I, § 6-A; *Lane Constr. Corp.*, 2008 ME 45, ¶¶ 28-29, 942 A.2d 1202 (recognizing the procedural due process rights of a project's opponents before a municipal planning board). The Due Process Clause "'protects against the exercise of arbitrary governmental power and guarantees equal and impartial dispensation of law according to the settled course of judicial proceedings or in accordance with fundamental principles of distributive justice.'" *Mutton Hill Estates, Inc. v. Town of Oakland*, 468 A.2d 989, 993 (Me. 1983) (quoting the trial court opinion with approval).

---

records, and actions, governed by the Freedom of Access Act, must be open to the public and their deliberations conducted openly. 1 M.R.S. §§ 401, 402(2)(C) (2012). Only in very limited exceptions does the Freedom of Access Act permit proceedings to take place without public notice and the opportunity for public participation. *See* 1 M.R.S. §§ 403(1), 405 (2012) (providing for nonpublic deliberations conducted during executive session or "as otherwise provided by statute").

After the Berwick Planning Board's initial decision on Berwick Iron's application, the Superior Court adeptly described the procedural issues as follows:

> The [abutters'] procedural challenges [to the Board's decision] are of great[] concern and suggest a lack of respect for and fair treatment of the [abutters] by the Board. Board members are volunteers who have assumed an often demanding and frequently thankless job. However, proceedings must be conducted consistent with due process such than an objective participant, win or lose, would conclude that he or she had been heard, that the result was not preordained and that the process was fair.

Because those issues were resolved after the Superior Court vacated and remanded the Planning Board's first decision and are not challenged by the abutters, we address only the issue of whether the email from the Planning Coordinator violates the abutters' due process rights.

[¶16]   However, "[w]hat constitutes due process in [a planning board] hearing, particularly one which is not adjudicating disputes between private parties, but is attempting to gather facts for the review of a [permit application] depends primarily upon the nature of the proceedings and the possible burden upon that proceeding." *Cunningham v. Kittery Planning Bd.*, 400 A.2d 1070, 1079 (Me. 1979).  This flexible concept of due process stems from the need of municipal bodies to play a variety of roles, akin to those of government agencies:

> [W]hen governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process.  On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used. . . . The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account.

*Hannah v. Larche*, 363 U.S. 420, 442 (1960); *see also In re Me. Clean Fuels, Inc.*, 310 A.2d 736, 745-48 (Me. 1973).

[¶17]   In the context of municipal planning boards, we have stated that due process entitles a party "to a fair and unbiased hearing." *Lane Constr. Corp.*, 2008 ME 45, ¶ 29, 942 A.2d 1202.  For example, we concluded that because the public had a full and fair opportunity to comment on an application, the planning board proceedings satisfied due process requirements, despite the board's request

for additional comments from the applicant without providing a contemporaneous opportunity for public comment. *Cunningham*, 400 A.2d at 1078-79; *see also Anderson v. New England Herald Dev. Grp.*, 525 A.2d 1045, 1046 (Me. 1987). However, a planning-board proceeding failed to satisfy due process requirements where the board rendered a decision in which some members of the board participating in the decision had not attended the hearings and had not "heard the evidence and assessed the credibility of the various witnesses." *See Pelkey v. City of Presque Isle*, 577 A.2d 341, 343 (Me. 1990).

[¶18] Communications between a decision-maker and only one party, without notifying the opposing party or providing that party with an opportunity to be heard, are ex parte communications that implicate the due process rights of the excluded party. *See Mutton Hill Estates, Inc.*, 468 A.2d at 992; *see also* Black's Law Dictionary 316 (9th ed. 2009) (defining "ex parte communication"). We will vacate a planning board's decision if, as a result of these communications, the decision results in "procedural unfairness." *Lane Constr. Corp.*, 2008 ME 45, ¶ 32, 942 A.2d 1202 (quotation marks omitted). Procedural unfairness refers to the idea that the ex parte communication affects "the integrity of the process and the fairness of the result." *Springfield Terminal Ry. Co. v. United Transp. Union*, 767 F. Supp. 333, 349 (D. Me. 1991); *see also Mutton Hill Estates, Inc.*, 468 A.2d at 992. For example, a planning board's decision to exclude members of

the public and the applicant during the board's fact-finding proceedings violated the due process rights of those excluded. *Mutton Hill Estates, Inc.*, 468 A.2d at 992.

[¶19]  The United States Court of Appeals for the District of Columbia Circuit has described the analysis of this issue as follows:

> [A] number of considerations may be relevant: the gravity of the ex parte communications; whether the contacts may have influenced the . . . ultimate decision; whether the party making the improper contacts benefited from the . . . ultimate decision; whether the contents of the communications were unknown to opposing parties, who therefore had no opportunity to respond; and whether vacation of the . . . decision and remand for new proceedings would serve a useful purpose.

*Prof'l Air Traffic Controllers Org. v. Fed. Labor Relations Auth.*, 685 F.2d 547, 564-65 (D.C. Cir. 1982) (footnotes omitted); *see also Springfield Terminal Ry. Co.*, 767 F. Supp. at 349.

[¶20]  Here, the court concluded that the email at issue did not taint the Board's decision. *See Lane Constr. Corp.*, 2008 ME 45, ¶ 32, 942 A.2d 1202.  We agree.  Although the abutters assert that Berwick Iron's approval of MacMillan & Donnelly influenced the Board's decision on whom it would hire, that assertion is unsupported by the evidence in the record.  Rather, the email discloses that the Board had already made its selection and merely sought Berwick Iron's approval because Berwick Iron would pay for the costs of the expert.  Thus, the gravity of

the ex parte communication is limited. *See Prof'l Air Traffic Controllers Org.*, 685 F.2d at 565.

[¶21] Further, although Berwick Iron benefitted from the Board's ultimate approval of the conditional use permit, the role of the ex parte communication in that approval is limited. The abutters had the full opportunity to respond to both the selection of and the findings by the Board's independent peer reviewer at the public hearing on November 17, 2011. *See Cunningham*, 400 A.2d at 1078-79; *Prof'l Air Traffic Controllers Org.*, 685 F.2d at 565. Finally, vacating the Board's decision and remanding with instructions to hire a new independent peer reviewer would not serve any purpose because, as discussed below, *see infra* ¶ 30, the Board ultimately found Berwick Iron's air emissions expert credible, and there is ample evidence in the record to support the Board's finding. *See Prof'l Air Traffic Controllers Org.*, 685 F.2d at 565. Therefore, the ex parte communication between the Board and Berwick Iron does not require us to vacate the Board's decision.

B.    Air Emissions Standards

[¶22] In reviewing a planning board's decision, we defer to the board's factual findings; "we do not substitute our own judgment for that of the Board," and will vacate its judgment only "if no competent evidence exists in the record to support it." *Nestle Waters N. Am., Inc. v. Town of Fryeburg*, 2009 ME 30, ¶ 33, 967 A.2d 702 (quotation marks omitted). "[T]he fact that the record before the

Board is inconsistent or could support a different decision does not render the decision wrong." *Id.* (quotation marks omitted). However, "[t]he interpretation of a local ordinance is a question of law, and we review that determination de novo." *Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶ 16, 868 A.2d 161; *see also Isis Dev., LLC v. Town of Wells*, 2003 ME 149, ¶ 3 n.4, 836 A.2d 1285 (stating that although we generally defer to a state agency's technical expertise, "[w]e review interpretations of local zoning ordinances by local volunteer boards de novo").

[¶23] "In interpreting a statute or ordinance, we look first to the plain meaning of its language to give effect to the legislative intent, and if the meaning of the statute or ordinance is clear, we need not look beyond the words themselves." *Wister v. Town of Mount Desert*, 2009 ME 66, ¶ 17, 974 A.2d 903. "Words [in the ordinance] must be given their plain and ordinary meaning and must not be construed to create absurd, inconsistent, unreasonable, or illogical results." *Bushey v. Town of China*, 645 A.2d 615, 617-18 (Me. 1994) (quotation marks omitted).

[¶24] The abutters argue that (1) the Board erred in relying on a study that based its evaluation on state and federal air quality standards; and (2) even if the evaluation was based on standards that were more stringent than state and federal requirements, the Board failed to make specific findings that the facility's air emissions would not be "injurious" or "detrimental to the enjoyment" of

neighboring properties. *See* Berwick, Me., Land Use Ordinance § 7.1 (Nov. 2, 2010). Section 7.1 of the Berwick Land Use Ordinance states:

> Emission of dust, dirt, fly ash, fumes, vapors or gases which could be injurious to humans, animals or vegetation, detrimental to the enjoyment of adjoining or nearby properties or which could soil or stain persons or property, at any point beyond the lot line of the commercial or industrial establishment creating that emission, shall not be permitted. Any air emissions must meet all applicable state and federal statutes.

[¶25] The plain language of section 7.1 of the Berwick Land Use Ordinance sets out a fixed test that prohibits three types of emissions: (1) "injurious" emissions, (2) emissions "detrimental to the enjoyment of" neighboring properties, and (3) emissions that "could soil or stain persons or property." In its 2012 judgment, the court determined that "[i]f compliance with state and federal statutes were sufficient[,] then the ordinance would have consisted solely of the second sentence." The court concluded that the Berwick ordinance must therefore be more stringent than state and federal statutes.

[¶26] However, even if the ordinance does restrict more emissions than state and federal laws, in the matter before us, the Board addressed those standards and made findings, supported by the record, that the proposal met the ordinance standards.

[¶27] The air emissions study that Berwick Iron provided to the Board stated that the Board could rely on compliance with the Clean Air Act as evidence

16

that the project complied with the ordinance because the national ambient air quality standards regulate the same types of emissions as those described in Section 7.1 of the ordinance.[4]  In the Clean Air Act, Congress authorizes the Administrator of the Environmental Protection Agency to establish the national ambient air quality standards, which "in the judgment of the Administrator, . . . are requisite to protect the public health," and "to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." 42 U.S.C.A. § 7409(b) (West, Westlaw through P.L. 113-49).  The Clean Air Act defines "welfare" as follows:

> All language referring to effects on *welfare* includes, but is not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and *deterioration of property*, and hazards to transportation, as well as *effects on economic values and on personal comfort and well-being*, whether caused by transformation, conversion, or combination with other air pollutants.

42 U.S.C.A. § 7602(h) (West, Westlaw through P.L. 113-49) (emphasis added). Emissions that "could be . . . detrimental to the enjoyment of" neighboring properties, Berwick, Me., Land Use Ordinance § 7.1, are very similar to those that may have "effects on  . . . personal comfort and well-being," 42 U.S.C.A.

---

[4]  Although section 7.1 of the ordinance refers to both state and federal statutes, in 2011, the Legislature repealed the Maine ambient air quality standards and amended the statute to provide that Maine's ambient air quality standards are equivalent to the national ambient air quality standards. *See* P.L. 2011, ch. 206, § 19 (codified at 38 M.R.S. § 584-A (2012)).  *See also* 42 U.S.C.A. § 7409 (West, Westlaw through P.L. 113-49) (providing for the establishment of the national ambient air quality standards); Berwick, Me., Land Use Ordinance § 7.1 (Nov. 2, 2010).

§ 7602(h). Similarly, those emissions that "could soil or stain persons or property," Berwick, Me., Land Use Ordinance § 7.1, are analogous to those emissions that have "effects on economic values," 42 U.S.C. § 7602(h). Thus, the Board did not err in relying on compliance with the national ambient air quality standards to support its conclusion, in part, that the facility would comply with section 7.1 of the Berwick ordinance.

[¶28] Although the Berwick Land Use Ordinance restricts the same types of emissions as those regulated by federal law, the ordinance is more restrictive than state and federal statutes in two ways. First, it has a broader scope. The Clean Air Act requires the Administrator of the Environmental Protection Agency to regulate those emissions that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C.A. § 7408(a)(1)(A) (West, Westlaw through P.L. 113-49). In exercising this administrative discretion, the Environmental Protection Agency has enacted detailed regulations of sulfur oxides, particulate matter, carbon monoxide, and lead, among many others. *See* 40 C.F.R. §§ 50.4-50.18 (West, Westlaw through Nov. 27, 2013). In contrast, the ordinance is not limited but applies to all air emissions. *See* Berwick, Me., Land Use Ordinance § 7.1. Second, the ordinance is more restrictive because it is fixed. If the federal standards and applicable state standards are relaxed in the future to permit the three types of emissions described

in the Berwick ordinance, then section 7.1 of the ordinance imposes independent requirements that must be met in addition to the state and federal standards.

[¶29]  The Planning Board had sufficient evidence to conclude that Berwick Iron's proposed project met the standard in section 7.1.  First, Berwick Iron provided the Board with a copy of the air emissions license granted by the Department of Environmental Protection for the proposed metal shredder.  The permit is evidence that, with regard to those sources regulated by federal law, the emissions would meet section 7.1.  Second, the study provided by Berwick Iron provided a conservative analysis of the proposed emission levels in two ways: first, by assuming the facility would operate twenty-four hours per day and 365 days per year, and second, by employing more stringent state environmental standards that have been repealed.

[¶30]  In granting the air emissions license for this project, the Department of Environmental Protection noted that the only emissions addressed in the license were those from the diesel engine and from the water sprays released by the shredder.  Both Berwick Iron's expert and the Board's independent peer reviewer agreed that in their professional judgment any emissions from other sources, including other parts of the shredder, the conveyor belt, movement of metals in sorting, storage, and separation, and road dust, would be minimal.  As a result, Berwick Iron's expert concluded, and the Board's independent peer reviewer

agreed, that the proposed project would not emit any of the three types of emissions restricted in section 7.1. The Board concluded that, due to these additional considerations, the proposed project would meet the requirements of section 7.1 of the ordinance, and that conclusion is supported by ample competent evidence in the record. *See Nestle Waters N. Am., Inc.*, 2009 ME 30, ¶ 33, 967 A.2d 702.

C.      Noise Standards

[¶31]  The abutters argue that the Planning Board erred in concluding that the proposed project would meet the provision of the Berwick Land Use Ordinance governing noise because live sound tests indicated that the shredder exceeded the maximum decibel levels set out in section 7.6 of the ordinance. The ordinance provides: "The maximum permissible sound pressure level of any continuous, regular or frequent source of sound produced by any activity shall be limited by the time period and land use district" listed in the ordinance. Berwick, Me., Land Use Ordinance § 7.6 (Nov. 2, 2010). The ordinance lists sixty decibels as the daytime limit in residential districts and seventy-five decibels as the daytime limit in industrial and commercial districts. *Id.* Further, section 7.6 provides an exception for a single period of fifteen minutes per day, in which the applicant may exceed the ordinary noise levels by up to ten decibels. *Id.*

20

[¶32]  The parties dispute whether the applicable noise level is measured from the place where the noise is generated, applying the decibel level that governs the district in which the property is located, or whether the noise level is measured wherever the noise can be heard.  The abutters argue that, because the shredder noise can be heard in the abutting residential district, the ordinance prohibits the noise emitted from the shredder from exceeding sixty decibels as measured in the residential district.

[¶33]  We need not resolve this issue, however, because the evidence in the record supports the Board's determination that the shredder would meet the lower sixty-decibel standard as measured at the neighboring property.  The Board found that "even if the Ordinance imposed a 60 [decibel] standard at an abutting residential district line, the evidence shows that the project will meet that standard, with only a single daily exception of less than 15 minutes, which is allowed by the Ordinance."

[¶34]  During the live sound test, the abutters' sound engineer recorded one instance at the end of the hour-long test during which the sound level at a neighboring property exceeded 60 decibels—measuring 61.4 decibels.  A representative of Berwick Iron testified that the sound levels increased during the last few minutes of the sound test because the operators clear all of the metal out of the machine when shutting down the machine, which causes an increase in the

noise levels. He further testified that the higher noise levels would occur only once per day and would be completed within the fifteen-minute period during which the operation is permitted to exceed the sound limitation by ten or fewer decibels. *See id.* The decibel measurements taken by the abutters' sound engineer supports the Board's finding, and, therefore, the Board did not err in determining that the proposed metal shredder would meet the noise standard in the ordinance. *See Nestle Waters N. Am., Inc.*, 2009 ME 30, ¶ 33, 967 A.2d 702.

The entry is:

> Judgment vacated. Remanded for entry of
> judgment affirming the Berwick Planning Board's
> approval of the land use permit.

---

**On the briefs:**

Matthew D. Manahan, Esq., Catherine R. Connors, Esq., and Dixon P. Pike, Esq., Pierce Atwood LLP, Portland, for appellant Berwick Iron & Metal Recycling, Inc.

Timothy S. Murphy, Esq., Prescott, Jamieson, Nelson & Murphy, LLC, Saco, for appellees Robert Duffy, et al.

**At oral argument:**

Matthew D. Manahan, Esq., for appellant Berwick Iron & Metal Recycling, Inc.

Timothy S. Murphy, Esq., for appellees Robert Duffy, et al.