STATE OF MAINE
YORK, ss.

SUPERIOR COURT
Civil Action
DOCKET NO. AP-17-0011

LEONARD A. PIERCE,

and

PATRICK N. CARON, TRUSTEES
10 BEACH PLUM LANE and
12 BEACH PLUM LANE
REALTY TRUSTS

Plaintiffs,

v.

**ORDER**

TOWN OF OGUNQUIT,

Defendant.

This case arises from an application for a permit to install a shared dock to be located at 12 Beach Plum Lane in Ogunquit, Maine. Plaintiffs are Leonard Pierce and Patrick Caron, trustees for 10 Beach Plum Lane and 12 Beach Plum Lane Realty Trusts (the "Trustees").

Plaintiffs filed an application for site plan approval titled "Site Plan Review for a Proposed Walkway and Pier with a Seasonal Ramp and Float" (the "Application") with the Ogunquit Planning Board (the "Board") on October 7, 2016. (R. 25-62.) Plaintiffs hired Eco-Analysts, Inc. to investigate the site and surrounding area to determine the feasibility of the proposed structure and to prepare and submit the Application. (R. 25, 33.)

The application proposed a "walkway and a pier with a seasonal ramp and float." (R. 25.) The walkway would measure four feet wide by one hundred and ninety feet long and would connect to a five-foot-wide by thirty-foot-long pier. (R. 25.) The pier would use long-span

1

construction and helical anchors[1] to minimize direct impacts, resulting in four and a half square feet of direct impact, four feet of which would be below the Highest Annual Tide mark. (R. 33.) The walkway's use of long-span construction and helical anchors would also result in an additional one and a half square feet of direct impacts on the coastal wetland. (R. 34.) To additionally minimize the adverse effects on the marsh, both the walkway and pier would be elevated with a minimum 1:1 height/width ratio. (R. 34.) The pier's height starts at five feet and rises to eight and a half feet. (R. 62c, 444.) The walkway's height starts at four feet and increases to five feet at its end. (R. 62c, 444.) The application stated, "The proposed structures are the minimum, necessary length to span intertidal vegetation and obtain navigable waters on a partial-tide basis." (R. 36.) Although the project would be shared by both properties, the project would lie entirely within the setbacks of 12 Beach Plum Lane. (R. 62b.)

Under the Town of Ogunquit's Zoning Ordinance (the "Ordinance"), the application was subject to in an person site plan review by the Board. (R. 13.) In its extensive review of plaintiffs' application, the Board held public hearings on November 14, 2016, January 23, 2017, February 27, 2017, March 13, 2017, March 27, 2017, and April 10, 2017. (R. 451, 470, 477, 508, 527, 558.) On March 13, 2017, the Board performed a sitewalk at the proposed site of the dock. (R. 500.)

During the course of its review, the Board received significant testimony from a variety of sources, both public and private. Given the breadth of the record, only a brief recap of the evidence relevant to this court's review of the Board's final decision will be undertaken. First, upon request from Eco-Analysts, the Maine Department of Inland Fisheries and Wildlife ("MDIFW") reviewed the proposal for the potential effect of the project as it is within a designated Essential Habitat for least terns and piping plovers, both of which are protected under the Maine Endangered Species

---

[1] These anchors are designed to minimally impact the construction area by only being installed with small, hand-held equipment and leaving only 0.25 square feet of impact to the soil once installed. (R. 183, 187.)

2

Act ("MESA"). (R. 59.) The MDIFW wrote that the project's construction could disrupt normal feeding and/or breeding behaviors of these species which would be an adverse action the Department considers a "Take." (R. 59.) However, the MDIFW stated that the project could avoid such a Take if it was constructed between September 16 and April 14, outside the breeding season for these birds. (R. 59.) The MDIFW, however, did note that this precaution "does not exempt, nor does it allow, any actions from applicant's activities, including during construction or other future activities that could be considered a Take of these species." (R. 59.) Additionally, the Trustees would still, upon obtaining a permit from the Board, need to submit a "Request for Project Evaluation" to the MDIFW for final approval. (R. 59.)

The Board also received comments on the Application from various Town officials and entities. The Ogunquit Conservation Commission found that "building a walkway across the tidal marsh and a pier in the tidal river cannot be beneficial to the environment." (R. 63.) The Commission thus concluded that it could not approve the project. (R. 63.) The Commission also specifically found that "[t]his project represents a permanent loss of at least 150 square feet of Ogunquit's salt water marsh," and "will alter and probably seriously endanger 1,188 square feet of salt marsh due to shading." (R. 196.) Additionally, the Commission noted that nesting plovers had been arriving earlier, at the end of March, the last two years, and suggested that the window for building the project would have to be shortened to the second or third week in March. (R. 197.)

The Harbor Master and Shellfish Warden expressed concern that the project would interfere with clam harvesting and other public rights such as navigation, fishing, and fowling. (R. 64, 70.) Both the Chief of Police and the Public Works director stated that they had no concerns with the project. (R. 65, 69.)

3

Following a site visit and review of the Application the Maine Department of Environmental Protection ("DEP") found that plaintiffs "avoided and minimized coastal wetlands impacts to the greatest extent practicable, and that the proposed project represents the least environmentally damaging alternative that meets the overall purpose of the project." (R. 182.) Additionally, the DEP concluded that "The proposed activity will not unreasonably harm any significant wildlife habitat, freshwater wetland plant habitat, threatened or endangered plant habitat, aquatic or adjacent upland habitat, travel corridor, freshwater, estuarine, or marine fisheries or other aquatic life." (R. 183.)

At the March 13 meeting of the Board, Bill Lee of the Ogunquit Conservation Commission testified about the project. (R. 510.) Mr. Lee stated that the project would cause "habitat fragmentation" and introduced three publications that outline the possible effects of this fragmentation. (R. 511-512.)

Additionally, the Board discussed what the proper "area" should be in order to apply Section 9.15(C)(4) of the Ordinance. In an email, Assistant Shoreland Zoning Coordinator for the DEP Michael Morse explained the Department's interpretation of the word "area" as follows:

> The word "area" is intended to be applied broadly and not to be limited to merely the directly abutting properties. If applying it as intended by the Department, the town would consider the general area of the shoreline, say within a reasonable eyeshot of the subject parcel. Or, within at least a quarter or half mile (if you want a randomly determined distance – certainly not limited to direct abutters though). The Department does not establish a set distance, but I'm sure you see the point of our comments.
>
> The standards do not differentiate between publicly and privately owned structures. Both types of structures should be considered by the town. Based on the description you provide here and provided on the telephone, plus considering my knowledge of the highly developed shoreline of Ogunquit, in general terms at least it seems perfectly reasonable to assume that the proposed dock will meet the standard.

(R. 303.) The Town's attorney also wrote an opinion letter to the Board concerning the definition of area. (R. 399.) In the letter, she states, "The correct interpretation of the word 'area' does not appear to be in dispute. Attorney Guay and I are in agreement with Mike Morse's opinion that this

4

term means that the Board must look up and down the river and not distinguish between public and private docks that are in existence." (R. 399.)

The plaintiffs also drew the Board's attention to a previous permit application for the construction of a similar dock that was approved in 2011. (R. 249-302.) This project also entailed constructing a portion of the dock over marsh grass. (R. 277.)

In conjunction with the instant application, the plaintiffs applied for and were granted construction permits by the Department of Environmental Protection ("DEP") pursuant to the Natural Resources Protection Act (38 M.R.S.A. § 480-C) and the Army Corps of Engineers. (R. 125, 138.) In its permit, the DEP stated analyzed whether the project's impact would be "unreasonable," meaning whether it would "cause a loss in wetland area, functions and values and there is a practicable alternative to the project that would be less damaging to the environment." (R. 129.) The DEP determined, "the applicant has minimized coastal wetland impact to the greatest extent practicable, and that the proposed project represents the lest environmentally damaging alternative that meets the overall purpose of the project." (R. 130.)

On April 10, 2017, the Board denied the application and adopted findings of fact and conclusions to support its decision. (R. 438, 444-450.) The Board concluded that the dock would violate the Ordinance because "it will not be consistent with existing conditions, use and character of the area that would be affected by the proposed structure." (R. 449.) This conclusion was based on the following findings: (1) the area that will be affected is the salt marsh between the existing public foot bridge and the stream located next to plaintiffs' properties, not the "reasonable eyeshot" area proposed by the plaintiffs; (2) the area as defined is the only significant marsh grass area that is outside of the Rachel Carson Preserve, is a foraging ground for the Least Tern and Piping Plover, and has no other bridges, piers, or wharves; and (3) the public footbridge, which was built before

5

the passing of the shoreland zoning provisions, is not a comparable structure because it crosses from a parking lot to the dunes and does not cross the marsh. (R. 449.)

The Board based these findings on the testimony provided at the public hearings as well as its own observations at the sitewalk, but specifically noted three studies introduced by Bill Lee to support its findings. (R. 449.) The first of these studies is *Effects of Long Piers on Birds in Tidal Wetlands* by Allison E. Banning, Jacob L. Bowmand, and Bruce Vasilas, which concluded that long piers have an adverse effect on avian communities in tidal marshes. (R. 449.) Next, the Board cited *Impacts of Docks and Piers on Salt Marsh Vegetation in MA Estuaries*, published by the Massachusetts Executive Office of Energy and Environmental Affairs, which concluded that although docks with a 1:1 height to width ratio help with shading impacts on salt marsh vegetation and that docks with heights of five feet or greater provide the least impact, these docks "still impact salt marsh vegetation growth, with a lower stem density compared to unshaded marsh" and "even docks designed to promote light penetration will result in salt marsh loss." (R. 449.) Third, the Board looked to *Final Report-Environmental Impacts of Docks and Piers on Salt Marsh Vegetation Across Massachusetts Estuaries* by John Logan, Amanda Davis, and Kathryn Ford of the Massachusetts Division of Marine Fisheries. (R. 450.) The Board cited that this study found that "some docks that were more than 5 feet in height resulted in stem densities that were less than 10% of densities in bordering unshaded areas. Docks of over 5 feet that were reviewed in the study had a median stem density of only 56% of the unshaded marsh. Even docks designed to promote light penetration 'will often result in high levels of salt marsh loss.'" (R. 450.)

Because of the evidence before it, specifically these studies, the Board concluded:

> The Board finds that because the salt marsh in this area is the predominant feature of the River and because it serves as a foraging area for both Least Terns and the endangered Piping Plover, the size of the structures completely bisect the marsh grass and will not be consistent and will conflict with the existing conditions, use and character of the area. Based upon the studies provided, the Board finds that the structures will impact the bird foraging areas and will have a negative impact on

6

existing salt marsh vegetation. The loss of habitat and vegetation due to the size of the proposed structures will conflict with the existing conditions, use and character of the area.

(R. 450.)

In addition to denying the application, the Board also discussed plaintiffs' concern that the Board was biased from outside research that was not in the record. (R. 436-437.) The plaintiffs were particularly concerned with emails between Board Member Mark MacLeod, the Board Chairman, Land Use Office Secretary Maryann Stacy, and others. (R. 305-308.) In the emails, MacLeod inquired "Can I, as a Board member, legally conduct research in town archives related to a permit application before us? Or should that be the Land Use Office?" (R. 308.) MacLeod was specifically interested in looking at prior pier applications and whether or not they had been approved. (R. 308.) Stacy responded by informing MacLeod, "The appropriate thing to do if you do any private research is to send it to me as soon as possible so that I can provide copies of it to the other board members and the applicant well before the meeting" and "The idea is to not surprise anyone, including the applicant, with additional information at the meeting." (R. 306.) Despite these emails, plaintiffs contend that MacLeod brought and discussed private research, specifically a report from the Maine Department of Inland Fisheries and Wildlife to a March 27, 2017 Board meeting. (Pl.'s Br. 31.)

## STANDARD OF REVIEW

In its intermediate appellate capacity, this court reviews decisions of administrative bodies for abuse of discretion, errors of law, and findings not supported by substantial evidence. *Otis v. Town of Sebago*, 645 A.2d 3, 4 (Me. 1994) (citation omitted). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Conservation Law Found. v. Town of Lincolnville*, 2001 ME 175, ¶ 6, 786 A.2d 616 (citations omitted). Additionally, "the fact that two or more conclusions can be drawn from the evidence

7

does not mean that a Board's finding is unsupported by substantial evidence." *Id.* (quoting *Gorham v. Cape Elizabeth*, 625 A.2d 898, 903 (Me. 1993)).

Interpretations of zoning ordinance provisions are questions of law that courts review *de novo. Priestly v. Town of Hermon*, 2003 ME 9, ¶ 7, 814 A.2d 995 (citation omitted). In its review, the court looks at the plain language of the ordinance, and "[t]he terms or expressions in an ordinance are to be construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole." *Id.* (quoting *Gerald v. Town of York*, 589 A.2d 1272, 1274 (Me. 1991)). The court also construes the language of the ordinance as "to avoid absurd, inconsistent, unreasonable or illogical results." *Melanson v. Belyea*, 1997 ME 150, ¶ 4, 698 A.2d 492. Although the court's interpretation of an ordinance is *de novo*, the court "will accord substantial deference to the Board's characterizations and fact-findings as to what meets ordinance standards." *Bizier v. Town of Turner*, 2011 ME 116, ¶ 8, 32 A.3d 1048 (citations omitted).

## DISCUSSION

### I.     The Constitutionality of Ordinance Section 9.15(C)(4)

As an initial matter, plaintiffs argue that the Ordinance provision on which the Board based its decision, 9.15(C)(4), is unconstitutionally vague. (Pl.'s Br. 33.) Section 9.15(C) applies to "Piers, Docks, Wharves, Bridges, and Other Structures and Uses Extending Over or Beyond the Normal High Water Line of a Water Body or Within a Wetland." (Ogunquit, Me., Zoning Ordinance ("Ordinance") § 9.15(C) (November 8, 2016); R. 15.) At issue here, subsection 4 requires, "The facility shall be no larger in dimension than necessary to carry on the activity and be consistent with existing conditions, use, and character of the area." (Ordinance § 9.15(C)(4); R. 16.)

The Law Court has previously examined the constitutionality of this exact language in *Lentine v. Town of St. George*, 599 A.2d 76 (Me. 1991). In *Lentine*, the Law Court noted, "By a well established principle of statutory construction, any ambiguity in the St. George Ordinance must be resolved to preserve its constitutionality." *Id.* at 78-79 (citing *State v. Horton,* 561 A.2d 488, 490 (Me. 1989)). Accordingly, the Court analyzed the section and found that the language "readily lends itself to an interpretation that avoids any question of unconstitutional vagueness." *Id.* at 79.

Specifically, the Law Court held, "[T]he last half of the section imposes merely a second criterion for judging the allowable size of a proposed wharf. In other words, . . . the Lentines' wharf may not be either (1) 'larger in dimension than necessary to carry on the activity' of deep water access for the Lentines' pleasure boat, or (2) 'larger in dimension than . . . [will] be consistent with existing conditions, use, and character of the area.'" *Id.* The Law Court construed the word "consistent" in the second part of the section as meaning "not conflicting or interfering with." *Id.* Thus, the second dimensional requirement of the section requires that a proposed pier or wharf "may not be so large that it conflicts or interferes with existing conditions, use, and character of the area that would be affected . . .." *Id.*

The Law Court came to this conclusion from looking to the section's context within the Ordinance to best determine the drafters' intent. *Id.* Like Section 9.15(C) of Ogunquit's Ordinance, St. George's Ordinance listed four separate requirements that applied specifically to piers, wharves, and similar facilities pertaining to "control of soil erosion, protection of developed beach areas, and minimization of adverse effects upon fisheries." *Id.* (*See* Ordinance §§ 9.15(C)(1-4); R. 16.) In this context, the Law Court stated, "[T]he consistency requirement cannot reasonably be read to relate to anything more than the proposed wharf's dimensions." *Id.* at 80.

9

With this standard, the Law Court found that the language provided "constitutionally adequate standards to guide the zoning boards in their decisions on applications for wharf permits." *Id.* at 79. The *Lentine* standard was again applied in *Stewart v. Town of Sedgwick*, 2002 ME 81, ¶ 10, 797 A.2d 27.

Given the Law Court's holding and its subsequent application, this court likewise finds that Section 9.15(C)(4) in conjunction with the *Lentine* standard provide adequate standards on which Boards can base their decisions relating to such permit applications.

## II. The Application of the 9.15(C)(4) Standard

In this case, the Board used the *Lentine* standard to conclude "The loss of habitat and vegetation due to the size of the proposed structures will conflict with the existing condition, use and character of the area." (R. 450.)

### a. The Board's Determination of the Relevant "Area"

Plaintiffs contend that the Board erred by defining the appropriate "area" as the less than quarter-mile stretch of "salt marsh area between the existing public footbridge and the stream next to Beach Plum Farm, in a narrow portion of the River." (R. 449.) The Board defined the area as such because the Board found that this was "the only significant marsh grass area that is outside of the Rachel Carson Preserve" in Ogunquit and is a foraging ground for the Least Tern and Piping Plover. (R. 449.) The Board then found that there were no other comparable structures in the area. (R. 450.)

This court cannot find that the Board abused its discretion by so limiting the "area" at issue. It based its determination on the specific characteristics of the surroundings. Although Michael Morse of the DEP stated that the term "area" should be applied broadly, should not be limited to abutting properties, and that the general intent is that the Board consider the general area of the

10

shoreline within a "reasonable eyeshot," the specific circumstances here tend to indicate that the area here is unique from the usual Ogunquit shorefront. Consequently, the Board did not abuse its discretion by narrowly defining "area" under the Ordinance.

Additionally, it should be noted that a broader definition of "area" has little practical effect on the Board's underlying decision or this court's review. Even if this court were to find that the "area" should have been more expansive, the final conclusion of the Board was that the project would not be consistent with the marshland habitat where it was being constructed because of its adverse effect on vegetation and wildlife. This conclusion would not change if the "area" were to expand to encompass more similar structures. In this court's opinion, the determinative issue to this case is whether the Board properly considered the project's effects on the marsh vegetation and habitat.

**b. Whether the Board Could Consider the Environmental Impact of the Proposed Project**

Plaintiffs argue that the Board inappropriately considered the environmental impact of the project in reaching its conclusion. Specifically, plaintiffs claim that it is the DEP, not the Board that is tasked with reviewing a proposal's impact on the Town's natural resources, not the Board. (Pl.'s Br. 39.)

However, the fact that the DEP also approves the project does not remove the Board's ability to take into account the environmental impact of applications. The Zoning Ordinance clearly contains provisions that directly relate to proposals' potential environmental impact. (*See* Ordinance § 9.15(C)(3) (Project's location must minimize adverse effects on fisheries); R. 16.) Simply because another governmental entity reviews projects' potential environmental impact does not preclude the Board from doing the same in accordance with the Town's Ordinance.

11

Further, the Ordinance and the DEP analysis involve different standards. While the DEP only looked at whether the project was unreasonable, section 9.15(C)(4) requires the project be consistent with the conditions, use and character of the area.

Thus, the Board did not err by considering the environmental impact of the application in pursuant to the Town's Ordinance, specifically section 9.15(C)(4).

### c. Whether the Proposed Project is Consistent with Existing Conditions, Use and Character of the Area

The *Lentine* Court held that the correct standard for provisions with the same language as the second part of 9.15(C)(4) is that a pier may not be: "(1) 'larger in dimension than necessary to carry on the activity', or (2) 'larger in dimension than . . . [will] be consistent with existing conditions, use, and character of the area.'" *Lentine*, 599 A.2d at 79. In the instant case, only the second requirement is at issue. As noted above, this requirement "cannot reasonably be read to relate to anything more than the proposed [project's] dimensions." *Id.* at 80.

Prior decisions applying this standard are few and far between. In *Lentine*, the wharf in question was proposed as:

> [A] permanent, pile-supported timber structure, 6 feet wide and 190 feet long, with a 32-foot-long ramp and a 20-by-16-foot floating dock attached to the wharf on a seasonal basis. With the proposed ramp and floating dock, the entire structure would extend a total of about 236 feet. The purpose of the wharf was to provide a deep-water dock for the Lentines' pleasure boat.

*Id.* at 77. Several neighbors opposed the wharf, citing the wharf's length and the negative impact it would have on the activity in the cove. *Id.* One neighbor noted that his lobster boat was bigger than the Lentines' pleasure craft but could be tied at his nearby 70-foot wharf for longer than the Lentine's could tie their boat at their extended wharf. *Id.* Another neighbor opposed the proposed wharf "on the ground that it would interfere with the flow of ice and thereby threaten his nearby lobster pound; it was estimated that such an ice 'pile-up could happen once in four years and cost thousands of dollars.'" *Id.* at 77. A third neighbor contended that if the proposed wharf was

"swung slightly to the northeast its length could be reduced by 50 to 140 feet," however doing so may have encroached on others' tidal rights. *Id.*

The Board agreed, finding that because of this risk, the proposal would not be consistent with the conditions, use, and character of the area. *Id.* On appeal, and after further explaining this standard, the Law Court found that the record did not compel a contrary finding because "[t]he Board had before it evidence that a wharf of the proposed size would interfere with the existing 'conditions, use, and character' of the cove by, for example, creating a danger of ice 'pile-up' that would threaten neighbors' property and businesses." *Id.* at 80.

In *Stewart v. Town of Sedgwick*, 2002 ME 81, 797 A.2d 27, the plaintiff argued that a proposed dock was inconsistent with the area, outlining "the pristine nature of the area," and introducing "photographs showing the beauty of Eggemoggin Reach." *Id.* ¶ 9. In response, the applicant noted and provided photographs of "a number of other docks within two miles" of the property. *Id.* The Board found that the proposed dock was consistent with the conditions, use, and character of the area and the Law Court again concluded that this finding was supported by substantial record evidence. *Id.*

In *First Step Land Dev. v. Town of Kittery*, 2006 Me. Super. LEXIS 143 (July 5, 2006), the Superior Court (York County, *Fritzsche, J.*) overturned the decision of a planning board that found that a proposed pier for subdivision owners on Spruce Creek in Kittery was not consistent with the existing conditions, use and character of the area. *Id.* at *4. The board so found because the town had not previously approved piers that could be used by non-waterfront owners. *Id.* at *2. The court, however, disagreed, finding that the project was "consistent with the existing conditions, use and character of the area in that it is a pier situated among others on Spruce Creek." *Id.* at *4. The court explained, "The Planning Board is not correct when it found that a pier must be limited

13

to a size only large enough to accommodate just shorefront property owners. That may be a custom or a tradition but is not consistent with the existing conditions, use and character of the area. At some point a pier could become so large that it would violate restriction (d) but that is not so in this case." *Id.* at *4-5.

These decisions indicate that the disputed language not only applies to size consistency with other similar present or past structures in the area (*Stewart* and *First Step*), but also to the possible effect that a project may have on the area itself (*Lentine*).

In the instant case, the Board concluded, "The loss of habitat and vegetation due to the size of the proposed structures will conflict with the existing conditions, use and character of the area." (R. 450.) This decision is in line with the *Lentine* case, which held that a wharf would be inconsistent with the existing conditions, use, and character of the area if it posed a threat to a nearby wharf due to the possibility of ice build-up.

Plaintiffs contend that the pier must be "larger in dimension *than necessary*" to be consistent with the conditions, use, and character of the area as is the case with the first provision of section 9.15(C)(4).[2] (Pl.'s Br. 42.) However, the *Lentine* decision makes clear that this language does not apply to the second portion of the section. The proper test is whether a project is "larger in dimension than . . . [will] be consistent with existing conditions, use, and character of the area,'" or in other words, "the proposed wharf [or pier] may not be so large that it conflicts or interferes with existing conditions, use, and character of the area that would be affected by the wharf [or pier]." *Lentine*, 599 A.2d at 79; *see also Stewart*, 2002 ME 81, ¶ 10, 797 A.2d 27 (Noting that the *Lentine* court interpreted the language to mean a project's "size could not be larger than necessary

---

[2] As noted above, the first part of the test is whether the project is "larger in dimension than necessary to carry on the activity." *Lentine*, 599 A.2d at 79.

14

for its purpose and its size had to be consistent with the conditions, use, and character of the area."). Consequently, the Board did not misapply the standard by failing to use the "than necessary" qualification while ruling on the consistency requirement of section 9.15(C)(4).

This court cannot conclude that the Board's finding that the project would not be consistent with the conditions, use, and character of the affected area is not supported by substantial evidence. It based its decision on multiple reports and the opinions of town officials such as the Ogunquit Conservation Commission. Although there is significant evidence on the record that the plaintiffs did what they could to minimize the environmental impact of the project, the record does not compel a contrary finding. Given this court's deference to the Board's "characterizations and fact-findings as to what meets ordinance standards," the Board's finding that the project violates section 9.15(C)(4) is not in error. *Bizier*, 2011 ME 116, ¶ 8, 32 A.3d 1048 (citations omitted).

### III. Due Process Claims

Plaintiffs' final argument is that the emails from Board Member MacLeod demonstrate that the Board's decision was "biased by ex parte research and conversations." (Pl.'s Br. 48.) "An administrative process may be infirm if it creates an intolerable risk of bias or unfair advantage." *Zegel v. Bd. of Soc. Worker Licensure*, 2004 ME 31, ¶ 16, 843 A.2d 18. Generally, "[e]x parte communications implicate the due process rights of the excluded party and will be grounds to vacate a 'decision if, as a result of [the] communications, the decision results in 'procedural unfairness,'" which calls into question the integrity and fairness of the decision." *Wolfram v. Town of N. Haven*, 2017 ME 114, ¶ 20, 163 A.3d 835 (quoting *Duffy v. Town of Berwick*, 2013 ME 105, ¶ 18, 82 A.3d 148). However, if a procedural error is harmless, it "will not be grounds to vacate a decision unless [it is] inconsistent with substantial justice and result[s] in prejudice." *Id.* (citation omitted).

15

The Maine Administrative Procedure Act provides, "All material, including records, reports and documents in the possession of the agency, of which it desires to avail itself as evidence in making a decision, shall be offered and made a part of the record and no other factual information or evidence shall be considered in rendering a decision." 5 M.R.S.A. § 9059(4).

Plaintiffs argue that Board Member Mark MacLeod used outside research to affect the Board's decision. Plaintiffs point to emails between MacLeod, the Board Chairman, and Land Use Office Secretary where MacLeod inquires whether he could do his own research. Plaintiffs also point to the March 27 meeting of the Board where MacLeod brought the Board's attention to an article that he had looked up on his own titled *Maine Issues and Profile Docks Piers and Shoreland Feeding and Roosting Areas*. (R. 535.) The Town argues that the same information in this article is found in the others cited by the Board in its decision. (Def.'s Br. 17.) Plaintiffs, however, claim that these other publications did not concern Maine specific research that is more applicable to the instant application. (Pl.'s Repl. 12.)

Even if the report was not properly introduced as evidence, there is not sufficient evidence to find that the report was used in any way in the Board's final decision. The Board outlined its bases for its conclusion that the project would adversely impact the marsh vegetation and bird foraging areas without reference to this report. There is no evidence that this report was mentioned again after the March 27 meeting. Plaintiffs have not shown any prejudice arising from the brief discussion of this report. Consequently, this court finds that any procedural error was harmless and not a violation of due process.

16

## CONCLUSION AND ORDER

For the foregoing reasons, the Board did not commit any error of law, abuse of discretion, or erroneous finding of fact in its decision. Further, there was no due process violation from Board member MacLeod's discussion of the report that was not properly in the record. The Board's decision is hereby affirmed.

The clerk shall make the following entries on the docket:

The decision of the Ogunquit Planning Board is AFFIRMED.

SO ORDERED.

DATE: JANUARY 2, 2018

John O'Neil, Jr.
Justice, Superior Court

ENTERED ON THE DOCKET ON: 1/2/18

17

ALFSC-AP-17-11




ATTORNEY FOR PLAINTIFFS:

SANDRA L. GUAY, ESQ.
WOODMAN EDMANDS DANYLIK
PO BOX 468
BIDDEFORD  ME  04005


ATTORNEY FOR DEFENDANT:

NATALIE L. BURNS, ESQ.
JENSEN BAIRD GARNDER HENRY
PO BOX 4510
PORTLAND  ME  04112-4510