STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-19-13

CYNTHIA COCHRAN, et al,

Petitioners

v.

THE INHABITANTS OF THE CITY
OF PORTLAND,

ORDER AND DECISION

Respondents

and

HAMMOND HOUSE, LLC, and KEVIN
O'ROURKE

Parties-in-Interest

Before the Court is Petitioners Cynthia Cochran, Carolyn Treat, Jessica Lockhart, Edith Woodward, Ellen Bailey, Catherine Clay, Steven Oldford, Kerry MacDonald, Elizabeth Freeman, and Martha Voland ("Petitioners")'s Rule 80B appeal of Respondent City of Portland's April 9, 2019 decision. Portland's Planning Board (the "Board") approved Parties-in-Interest Hammond House, LLC and Kevin O'Rourke (the "Applicants")'s site plan to construct a new building located on Hammond Street. For the following reasons, the Board's decision is affirmed.

I.    **Factual Background**

Petitioners are residents and property owners in the East Bayside neighborhood in Portland, Maine. (Compl. ¶¶ 1-10.) Respondent City of Portland is a municipality located in Cumberland County, Maine. (Compl. ¶ 11.) Party-in-Interest Hammond is a Maine limited liability company that seeks to redevelop properties on Hammond Street. (Compl. ¶ 12); (R. 659.) Party-in-Interest

Kevin O'Rourke is the owner of the properties at issue in this proceeding, which are located at 4, 6, 8, and 10 Hammond Street, Portland, Maine. (Compl. ¶ 13.)

On November 26, 2018, Acorn Engineering Inc. submitted a Level III Site Plan Application (the "Initial Plan") on behalf of the Applicants d/b/a The Preserve at South Ridge, LLC.[1] (R. 186.) The Initial Plan proposed a project that seeks to redevelop multiple parcels totaling 15,433 square feet located in an R-6 Residential Zone (the "Proposed Project"). (R. 659.) The Proposed Project seeks to construct a three story, sixteen unit, residential condominium with subsurface parking. (R. 186.) The neighborhood around the Proposed Project consists of a high proportion of single-family structures that are typically one and two stories, though there are several three-story buildings within a block radius of the Proposed Project. (R. 659.)

Level III Site Plan reviews in Portland are required on "any new structures having a total floor area of ten thousand (10,000) square feet or more in all zones except the Industrial zones and IS-FBC zone." Portland, Me. Code § 14-523(f)(1); (R. 51.) The Proposed Project's floor area is planned to be well over 10,000 square feet and is located in an R-6 Residential Zone. (R. 659.) As the project is in an R-6 Residential Zone it most comply with the standards contained in Portland's Zoning Ordinance section 14-526(d)(9). Portland Zoning Ordinance section 14-526(d)(9)(a) states that "certain zones . . . are subject to design standards in addition to the provisions of Section 14-526(a) in order to ensure designs that contribute to and enhance the goals and policies for specific districts of [Portland]." Portland, Me. Code § 14-526(d)(9)(a); (R. 95.) Portland's R-6 Residential Zone is one of the "certain zones" that is subject to additional design standards. Portland, Me. Code §§ 14-526(d)(9)(a)(v) & (vi)(d); (R. 97.) The additional design standards for an R-6 Residential Zone are found in Appendix 7 of the City of Portland Design

---

[1] Now D/B/A Party-in-Interest Hammond. (R. 695, Lines 4-12.)

2

Manual labeled, "the R-6 Infill Development Design Principles & Standards" ("R-6 Design Standards").[2] (R. 169.)

The Proposed Project was reviewed under the R-6 Alternative Design Review found in section IV of the R-6 Design Standards. (R. 176-77, 417, 463.) The R-6 Design Standards contains seven broad Design Principles and each individual Design Principle contains more specific Design Standards. (R. 170-77.) The R-6 Alternate Design Review, which was used by the Board for the Proposed Project states:

> The [R-6 Design] Standards [] are time-honored ways of achieving the Design Principles. With exceptional care, though, it is possible to apply a design approach that meets the Principles through alternatives that vary from the Standards, while maintaining and relating to the predominant character-defining architectural elements of the neighborhood, such as the building location on the site, its relationship to the street, and its mass, form, and materials. The guiding principle for new construction under the alternative design review is to be compatible with the surrounding buildings in a two block radius, in size, scale, materials and siting, as well as the general character of the established neighborhood.

(R. 176-77.) The R-6 Alternative Design Review section continues:

> An applicant may propose an alternative design approach and request an Alternative Design Review. The Planning Authority under an Alternative Design Review may approve a design not meeting on or more of the individual standards provided that all of the conditions listed below are met. . . .
>
> A. The proposed design is consistent with all of the Principle Statements.
> B. The Majority of the Standards within each Principle are met.
> C. The guiding principle for new construction under the alternative design review is to be compatible with the surrounding buildings in a two block radius in terms of size, scale, materials and siting, as well as the general character of the established neighborhood, thus Standards A-1 through A-3 shall be met.

---

[2] Portland argues that the R-6 Design Standards do not apply to the Proposed Project. (Resp't's Br. 8.) Because the Court has determined that the Board's approval, which applied the R-6 Design Standards, was not an error of law or an abuse of discretion and that the decision was supported by substantial evidence in the record the Court declines to consider this unnecessary question, especially since this issue was not raised or discussed in lower proceedings.

D. The design plan is prepared by an architect registered in the State of Maine.

(R. 177.) Under the R-6 Alternative Design Review, apart from Design Standards A-1, A-2, and A-3, no single Design Standard must be met, yet a proposed design must be consistent with each Design Principle, and the majority of the Design Standards contained in each Design Principle must be met.

Specifically, at issue in this proceeding are Design Principles A and B. (*See* Pet'rs' Br. 30-37.) Design Principle A addresses the overall context of a proposed building design. (R. 170.) The overview of Design Principle A provides that:

> A building design <u>shall</u> contribute to and be compatible with the predominant character-defining <u>architectural features</u> of the neighborhood.
> Explanatory Note: The central idea behind good design in an established neighborhood is to reinforce positive features of the surrounding area, which provide its unique identity. To a large degree, <u>the scale, mass, orientation, and articulation</u> of an infill building <u>should</u> be compatible with that of the buildings that surround it. . . .
> While <u>there is no specific solution</u> for a given setting, <u>there are a number of building characteristics which can be used to gauge visual compatibility</u> of new residential construction in an existing neighborhood. These characteristics include design elements such as:
> 1. Scale and Form . . . 2. Composition of Principal Facades . . . 3. Relationship to the Street.

(R. 170-71 (emphasis added).) Petitioners point to Design Principle A, Design Standard A-1: Scale and Form, as a specific Design Standard that the Proposed Project did not meet. (Pet'rs' Br. 30.) Design Standard A-1 states:

> Scale and Form – Relate the scale and form of the new building to those found in residential buildings within a two-block radius of the site, <u>that contribute to and are compatible with the predominant character-defining architectural features of the neighborhood</u>. Special attention shall be given to the existing building forms on both sides of the street within the block of the proposed site.

4

(R. 171.) As stated above this Design Standard must be met in order for a project to comply with the R-6 Alternative Design Review.

Additionally, Petitioners point to Design Principle B which deals with the massing of proposed building designs. (Pet'rs' Br. 30-31.) The overview of Design Principle B states:

> The massing of the building reflects and reinforces the traditional building character of the neighborhood through a well composed form, shape and volume.
> Explanatory Note: Massing is a significant factor that contributes to the character of a building. The building's massing (as defined by its bulk, size, physical volume, scale, shape and form) should be harmonious with the massing of existing buildings in a two block radius. The massing of a building can be defined as the overall geometry (length, width, and height) of its perceived form. The overall height of the form (actual and perceived) as well as the geometry of its roof is of particular importance in defining the massing of a building.

(R. 171 (emphasis added).) Petitioners highlight Design Standard B-1 as a standard that the Proposed Project did not meet. (Pet'rs' Br. 30-32.) Design Standard B-1 states:

> Massing – The building's massing (as defined by its bulk, size, physical volume, scale, shape and form) should be harmonious with the massing of existing buildings in a two block radius.

(R. 172 (emphasis added).) As made clear by the R-6 Alternate Design Review, a building design need not meet this specific Design Standard as long as the project is consistent with Design Principle B as a whole and meets a majority of the Design Principle B Design Standards.

On February 19, 2019, Portland's Urban Designer Caitlin Cameron issued a review of the Initial Plan, finding that the Proposed Project as presented in the Initial Plan did not pass all of the criteria of the R-6 Alternate Design Review. (R. 417-22.) Urban Designer Cameron described the Context of the neighborhood as "predominately single and two-family buildings with simple forms, one and a half to two and a half stories in height . . . Larger multifamily buildings typically

5

are 3 stories, use balconies or bay windows, flat roofs, and vertical proportions." (R. 418.) The report continued stating that in the "rare instances where a larger scale, wider building has been built, the scale is mitigated by keeping setbacks as a buffer and through massing variation with elements such as bay windows and porches and scaling elements such as canopies material variation, and balconies." (R. 418.)

As to Design Standard A-1, Urban Designer Cameron found that:

> Overall, the project is much larger in scale and massing than found in the context – staff do not find the design relates enough to the scale and form of the surrounding residential buildings. Staff suggest mass and scaling elements be incorporated and that the roof form be simplified in order to meet the standard.

(R. 418.)

In her review of the Initial Plan, Urban Designer Cameron found that the Design Standard B-1 was also not met and that "[g]iven the scale and massing of this new project[, it] is taller and wider than the residential context, other design elements must be used to meet the standards around compatibility." (R. 419.) Urban Designer Cameron added that "[t]he overall massing of the building is not successfully broken down to relate to the scale of the surrounding buildings." (R. 419.) As to Design Principle B overall, Urban Designer determined "the massing as proposed [does not] meet the standard [of being] harmonious with the massing of the existing buildings – especially regarding scale and form." (R. 419.) Specifically, she found that "[t]he roof form is adulterated by numerous rooftop appurtenances and stair towers that do not reflect or reinforce the traditional building character of the neighborhood." (R. 419.)

On February 22, 2019, Portland's City Planner Matthew Grooms sent a memorandum to the Board regarding his and Urban Designer Cameron's assessment of the Initial Plan prior to the First Workshop. (R. 403-14.)

6

On February 26, 2019, the Board held the First Workshop during which the Proposed Project was discussed and reviewed. (R. 429-30.) During the First Workshop the Board agreed with Urban Designer Cameron finding that the "development felt too large in relation to the surrounding properties." (R. 661.) "Board members identified roof-top appurtenances as needing to be evaluated for visual impact." (R. 661.) Additionally, the Board "observed that the building felt institutional, due in part to the sculpture, concept signage and entrance design." (R. 661.)

Applicants took note of the comments provided at the First Workshop and by Urban Designer Cameron and, on March 14, 2019, submitted a new plan (the "Revised Plan"), which incorporated the following changes:

> 1.) Removed roof top decks and stairwells (reducing the height of the building by 10 feet
> 2.) Recessed Main Entry to scale the front façade
> 3.) Moved stair and elevator deeper into building and away from front façade, eliminating elevator over ride which was a prominent feature on the front façade and added living space on the street
> 4.) Removed a sculpture and replaced it with planters to better identify public and private place
> 5.) Added a quasi-front porch and columns further contextualizing the building with other multi-family properties in the vicinity
> 6.) Simplified building materials to be more uniform, material colors were lightened and strategically chosen to downplay scale of building
> 7.) Added bays to front façade to scale the building's width and pay tribute to triple decker typology
> 8.) Changed to a more traditional cornice which was more contextual
> 9.) Added recessed decks at the midpoint of side façades to break up the scale of building
> 10.) Brought down cornice 1 story and changed material color at 3rd floor on Fox street façade to scale building
> 11.) Removed Hallway space on front façade and replaced with residential space
> 12.) Added porch columns at street façade corner porches to a more contextual triple decker context
> 13.) Added notched corner deck to West End of Fox street Facing façade to scale elevation length down

(R. 431-432, 662.)

On March 19, 2019 Urban Designer Cameron issued a second review of the Proposed Project as presented in the Revised Plan finding that it passed all of the criteria contained in the R-6 Alternate Design Review. (R. 463-67.) In her report Urban Designer Cameron stated:

> Some scale mitigation has been achieved by varying the massing at the front, maintaining a three-story flat roof, and varying materials - in the revised proposal, significant and effective massing variation was introduced to better relate this larger building with the context. The design creates façade compositions reminiscent of triple-deckers at the corners of the building to create a relatable scale and form. . . . Staff suggested mass and scaling elements be incorporated and that the roof be simplified in order to meet the standard – these were adopted.

(R. 464.) As to Design Standard B-1 Urban Designer Cameron found that "the proposed massing variation breaks down the perceived scale." (R. 465.) She also reported that "[w]here previously the building relied on surface-level elements to integrate the larger scaled building, now there are physical pushes and pulls to the massing – the effect is masses and forms that relate to the scale and proportions of the context." As to Design Principle B as a whole, Urban Designer Cameron found:

> The project revisions increased the amount of massing variation to elicit references to the proportions, forms, and massing found in traditional multi-family buildings and to mitigate the scale impact of this larger building adjacent to small, single family buildings. . . . though the project is larger in scale [than] the adjacent buildings, [] the massing now creates a building that reflects and reinforces the traditional building character of the neighborhood.

(R. 464-65.)

On March 22, 2019, City Planner Grooms sent a second memorandum to the Board regarding his and Urban Designer Cameron's assessment of the Proposed Project contained in the Revised Plan prior to the Second Workshop. (R. 500-07.)

On March 26, 2019, the Board held a Second Workshop to discuss the Proposed Project. (R. 498-99.) At the Second Workshop the Board found that "the project was considerably larger than other development in the immediate vicinity," however "the project was permitted under zoning as currently written." (R. 662.) The Board followed this up by questioning Urban Designer Cameron on why she believed the R-6 Alternative Design Review was satisfied. (R. 662.)

On March 29, 2019, the Applicants submitted the Final Plan (the "Final Plan") for the Proposed Project. (R. 544-583.) On April 2, 2019, Urban Designer Cameron issued a final review, finding that the Final Plan did not revise any of the design plans presented at the Second Workshop but did provide additional studies and details. (R. 584-85.) Urban Designer Cameron once again recommended that the Proposed Project passed all of the R-6 Alternate Design Review criteria. (R. 584-85.)

On April 5, 2019, City Planner Grooms sent a third memorandum to the Board regarding the Final Plan prior to the Public Hearing. (R. 592-607.)

On April 9, 2019, the Board held a Public Hearing to discuss the possible approval of the Proposed Project. (R. 624-25.) During the Public Hearing a considerable amount of discussion occurred on whether the Proposed Project met the R-6 Design Standards A-1 and B-1 as analyzed under the R-6 Alternative Design Review. (*See* R. 744, 749, 756-60, 68-70.)

At the conclusion of the Public Hearing the Board voted to approve the Proposed Project with 10 conditions of approval 5-1 (Board Member David Silk being the only opposing vote). (R. 649-51.) On April 11, 2019, the Planning Board issued a letter to the Applicants detailing the Board's April 9th Decision. (R. 652-57.) The Board's decision granted the Applicant's waivers

9

for driveway length and driveway separation, and approved a payment in-lieu of workforce housing. (R. 652-53.)

## II. Procedural History

Petitioners filed a complaint for appeal of government action pursuant to Rule 80B on May 9, 2019. M.R. Civ. P. 80B. In the complaint, Petitioners allege (1) the Board erred when it failed to apply the R-6 Infill Design Standards A-1 through A-3 when reviewing the Proposed Project, (Compl. ¶ 27); (2) the Board erred when it failed to consider comments made by the public with respect to the R-6 Infill Design Standards A-1 through A-3 when reviewing the Proposed Project, (Compl. ¶ 28); (3) the Board failed to recognize that the Proposed Project failed to meet the requirements of Portland's Comprehensive Plan, (Compl. ¶ 29); and (4) the Board's approval of the Proposed Project was arbitrary, capricious, constituted an error of law, and is not supported by substantial evidence. (Compl. ¶ 30.)

Petitioners filed their brief in support of their Rule 80B appeal on July 2, 2019. Applicants filed their brief on July 30, 2019. Portland filed its brief on August 1, 2019. Petitioners filed a reply brief on August 15, 2019.

## III. Discussion

a. Standard of Review

The Court reviews Board decisions for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record. *Aydelott v. City of Portland*, 2010 ME 25, ¶ 10, 990 A.2d 1024. "Substantial evidence exists when a reasonable mind would rely on that evidence as sufficient support for a conclusion; the possibility of drawing two inconsistent conclusions does not render the evidence insubstantial." *Adelman v. Town of Baldwin*, 2000 ME 91, ¶ 12, 750 A.2d 577. The Court may not substitute its judgment for that of the Board. *Tarason v. Town of S.*

10

*Berwick*, 2005 ME 30, ¶ 6, 868 A.2d 230. Petitioners bear the burden "of showing that the record evidence compels a contrary conclusion." *Id.*

The interpretation of a local ordinance is reviewed *de novo*. *Town of Vassalboro v. Barnett*, 2011 ME 21, ¶ 6, 13 A.3d 784. "The terms or expressions in an ordinance are to be construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole." *Fissmer v. Town of Cape Elizabeth*, 2017 ME 195, ¶ 15, 170 A.3d 797 (quotation marks omitted). However, the Court will accord "substantial deference to local characterizations or fact-findings as to what meets ordinance standards." *Balano v Town of Kittery*, 2017 ME 110, ¶ 2, 163 A.3d 144 (*per curiam*)(quotation marks omitted). Thus, the interpretation of the R-6 Design Standards is reviewed *de novo* and the Board's finding as to what met those standards is given substantial deference. *See Jordan v. City of Ellsworth*, 2003 ME 82, ¶ 9, 828 A.2d 768.

When interpreting an ordinance, the Court first looks at "the plain meaning of its language," and "if a term is specifically defined in an ordinance, [the Court] will not redefine it." *21 Seabran, LLC v. Town of Naples*, 2017 ME 3, ¶ 12, 153 A.3d 113 (quotation marks omitted).

b. The R-6 Alternative Design Review

Petitioners argue that the Board failed to strictly apply mandatory R-6 Design Standards when it approved the Proposed Project. (Pet'rs' Br. 27-34.) Petitioners further argue that this failure led to the Board adopting a "nuanced" interpretation of the R-6 Design Standards that are contrary to its plain meaning, which constituted an error of law. (Pet'rs' Br. 34-38.) Finally, Petitioners seek a ruling that the Board's finding that the Proposed Project complied with the R-6 Design Standards was not supported by substantial evidence. (Pet'rs' Br. 34-38.) Applicants argue

11

that the Board committed no errors of law and that the Board's approval was supported by substantial evidence. (PII's Br. 9-25.)

Petitioners seek an interpretation of the R-6 Design Review Standards that they contain mandatory requirements that must be strictly applied with no discretion afforded to the Board in determining what meets the R-6 Design Standards. (Pet'rs' Br. 31-33.) However, the R-6 Design Standards, and especially the R-6 Alternative Design Review, are not and cannot be applied as strictly as other zoning ordinances as Petitioners wish. Only a few of the Design Standards contain specific quantifiable measurements, (i.e. Design Standard B-6, states that in certain instances a "garage door may be no more than 40% of the width of the building's overall façade," (R. 172)), and even these Design Standards are not required to be met under the R-6 Alternative Design Review, (R. 177 ("The Planning Authority under an Alternative Design Review may approve a design not meeting one or more of the individual standards provided.")). The R-6 Design Standards are not comparable to requirements found in the Portland Zoning Ordinance, such as the zoning ordinance setting a maximum height of a principal structure at 45 feet, Portland, Me. Code § 14-139; (R. 27), where a violation is clear and the Board is not afforded discretion.

It is clear from its plain meaning, that the R-6 Design Standards are meant to be a comprehensive, yet fluid guide used by the Board to ensure that new buildings conform with the general character of the existing neighborhoods. (*See* R. 159, 176-77.) There are no strict instructions contained in the R-6 Design Standards that state exactly how an applicant must meet its standards. The plain meaning of the language used in the R-6 Design Standards indicates that the Design Standards are extremely flexible. (*See* R. 170 ("[A]n infill building should be compatible with that of the buildings that surround it." (emphasis added)); R. 171 & 172 ("The building's massing . . . should be harmonious with the massing of existing buildings in a two block

radius." (emphasis added))). The R-6 Design Standards contain no minimum or maximum threshold requirements or cutoffs such as a new building cannot be ten times larger than the average size of a house found in the neighborhood, in fact the Design Standards' explanatory note on massing offers an alternative definition of massing that states "[t]he massing of a building can be defined as the overall geometry (length, width, and height) of its <u>perceived form</u>." (R. 171 (emphasis added).)

While there might be a scenario where a proposed building does not meet the R-6 Design Standards and would be cause for the Board to deny approval of a proposed project, such as if the massing of a new building were larger than the existing structures <u>and</u> no efforts were made by the applicant to scale its massing or no efforts were made to adopt the architectural nature of the neighborhood, there is not a strict massing cutoff contained in the R-6 Design Review Standards that would categorically require the Board to deny a project.[3] Thus as stated by Urban Designer Cameron at the Public Hearing "[t]he design standards don't require for buildings to replicate what's around it . . . [i]t requires compatibility. It uses words like compatibility, in harmony with. So then it becomes an interpretation question." In this case the Board determined that the measures taken by the Applicants made the Proposed Project harmonious with the neighborhood.

The next issue that must be determined is whether the Board's decision that the Proposed Project met the requirements of the R-6 Alternative Design Review, specifically Design Standard

---

[3] The Court has not been asked to, nor will it, scrutinize whether the R-6 Design Standards are unconstitutionally vague. *See Bushey v. Town of China*, 645 A.2d 615, 618 (Me. 1994) ("A statute is unconstitutionally vague only when it sets guidelines which would force men of general intelligence to guess at its meaning, leaving them without assurance that their behavior complies with legal requirements and forcing courts to be uncertain in their interpretation of the law." (quotation marks omitted)). A finding that this statute is vague would not benefit Petitioners or change the outcome of the Board's approval. *See Valdastri v. Bath*, 521 A.2d 691, 692 (Me. 1987).

13

A-1 and Design Principle B,[4] was supported by substantial evidence. *See Adelman*, 2000 ME 91, ¶ 12, 750 A.2d 577.

Design Standard A-1 is met if an applicant relates "the scale and form of the new building to those found in residential buildings within a two-block radius of the site, that contribute to and are compatible with the predominant character-defining architectural features of the neighborhood." (R. 171.) The Board is directed to give special attention "to the existing building forms on both sides of the street within the block of the proposed site." (R. 171.) As to Design Principle B Massing, this Design Principle is met if "[t]he massing of the building reflects and reinforces the traditional building character of the neighborhood through a well composed form, shape, and volume" and most of the Design Principle B Design Standards are met. (R. 171, 177.) Petitioners and Respondents do not argue over Design Standards B-2 through B-6, the Court finds that the parties agree that the Proposed Project meets those Design Standards and therefore the argument is whether the Proposed Project is consistent with Design Principle B as a whole. (R. 177.)

The question of massing is the central issue to both Design Standard A-1 and Design Principle B, the Court will address the two issues as a single question. The Board heard testimony from Urban Designer Cameron that while this project was "larger in scale, width, and footprint and depth than the buildings around it" the project used forms, attributes, and characteristics that help relate the scale and match the predominant characteristics of buildings in the neighborhood. (R. 733, Lines 1-5.) Some of the approaches taken to do this are captured in the Applicant's Revised Plan. (R. 431-32.) The Board heard evidence that the Applicants visually made the

---

[4] Under the R-6 Alternative Design Review, Design Standard B-1 is not required to be met if the Proposed Project is consistent with Design Principle B as a whole and a majority of the Design Principle B Design Standards are met. (R. 177.)

14

Proposed Project seem smaller (its perceived form) by removing the roof top appurtenances, recessing the entry creating a push and pull façade that breaks up the front facade, cutting the porches into the façade further breaking up the side facades, varying the building colors and materials which also breaks up the massing of the building, and adjusted the cornice. (R. 464-65, 721, Lines 21-31, 722, Lines 1-11, 733, Lines 2-31, 744, Lines 14-26.) Much of this same evidence also could support a finding that the Proposed Project was in keeping with similar multifamily and three story buildings in the neighborhood. (R. 464-65, 721, Lines 21-31, 722, Lines 1-11, 733, Lines 2-31, 744, Lines 14-26.) The Board heard in Urban Designer Cameron's testimony that the Proposed Project's placement contributes to the street because it is a continuation of the existing street scape pattern. (R. 733, Lines 19-31.) The Proposed Project's consistency with the neighborhood is further demonstrated by the Applicants placing the living spaces at the front of the building which reflects how single family homes look. (R. 733, Lines 19-31.) The Court believes that the testimony provided at the Workshops and Public Hearing, the staff reports, and the information contained in the Applicant's multiple Site Plans constitutes substantial evidence that the Board may rely on. *See Adelman*, 2000 ME 91, ¶ 14, 750 A.2d 577 (finding that testimony provided at a hearing constituted "substantial evidence").

Petitioner's correctly point out that the Board also heard evidence that the mass of the building was incompatible with the neighborhood regardless of what architectural measures were taken to hide, break up, scale, or change its massing. (Pet'rs' Br. 32-34); (*see* R. 423-28, 508-13, 608-23, 704-08, 728-731, 750-55.) However, the Board is not bound to accept any evidence as true, and as the fact finder may weigh contradicting evidence when making a determination. *See Adelman*, 2000 ME 91, ¶ 14, 750 A.2d 577. Petitioners wish for the Court to determine that the Proposed Project's scale and mass was a violation of the R-6 Alternative Design Standards,

15

however, the Court may not substitute its own judgment for that of the Board. *Tarason*, 2005 ME 30, ¶ 6, 868 A.2d 230. Furthermore, the Court will accord "substantial deference to local characterizations or fact-findings as to what meets ordinance standards." *Balano*, 2017 ME 110, ¶ 2, 163 A.3d 144 (*per curiam*) (quotation marks omitted). The Court may only determine whether the Board's decision was an error of law, an abuse of discretion, or was not supported by substantial evidence in the record. *Aydelott*, 2010 ME 25, ¶ 10, 990 A.2d 1024.


c. The Comprehensive Plan

Petitioners argue that the Boards erred by not requiring the Proposed Project to comply with Portland's Comprehensive Plan (the "Comprehensive Plan"). (Pet'rs' Br. 38-39.) Respondents refute this claim and argue that the Comprehensive Plan does not establish any standards that must be administered by the Board. (PII's Br. 26.) (Resp't City's Br. 15-16.)

The Court agrees with Respondents, as stated by the Law Court in *Nestle Waters N. Am., Inc. v. Town of Fryeburg*:

> The comprehensive plan and the land use ordinance are complementary, but their purposes are different. The plan sets out what is to be accomplished; the ordinance sets out concrete standards to ensure that the plan's objectives are realized. The two are not meant to be interchangeable. A comprehensive plan imposes an obligation on the town, not on private citizens or applicants for permits. It dictates how the town effectuates its land use planning obligations. The ordinance is the translation of the comprehensive plan's goals into measurable requirements for applicants.

2009 ME 30, ¶ 24, 967 A.2d 702 (internal footnotes omitted).

The entry is

> The Decision of Respondent City of Portland's Planning Board Review is AFFIRMED.

16

The clerk is directed to enter this order into the docket by reference pursuant to M.R.Civ.P. 79(a).

Date:   March 16, 2020

Harold Stewart, II
Justice, Superior Court

Entered on the Docket: 3-15-2020

17